CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 19 2016

JULIA C. DUDLEY, CLERK
BY:
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

SHERRY LYNN THORNHILL, )
for herself and as Administrator of the )
Estate of her son, Shawn Christopher Berry, )
deceased, individually and on behalf of )
all others similarly situated, )
                      )
        Plaintiff, )
                      )
v. )
                      )
F. GLENN AYLOR, et al., )
                      )
        Defendants. )
                      )

Civil Action No. 3:15-CV-00024

**MEMORANDUM OPINION**

By: Hon. Glen E. Conrad
Chief United States District Judge

Plaintiff Sherry Lynn Thornhill, on behalf of herself and as administrator of the estate of her son, Shawn Christopher Berry, filed this action pursuant to 42 U.S.C. § 1983 and Virginia Code § 8.01-50, et seq., against the Central Virginia Regional Jail Authority (the "Authority"), Superintendent F. Glenn Aylor, and several employees at the Central Virginia Regional Jail ("CVRJ"), arising out of Berry's death while in custody. The case is presently before the court on defendants' motions to dismiss and the Authority's motion to deny class certification. For the following reasons, the court will grant the motions to dismiss filed by defendants Erin O. LaPanta, Robert J. Counts, Jeremy D. Boston, Michael Horrocks, Eric Last, and Thomas Vogt, will grant in part and deny in part the Authority's motions to dismiss, and will deny the remaining defendants' motions to dismiss. The court will also grant the Authority's motion to deny class certification. As such, the court will dismiss Count I of the complaint, the claim on behalf of the proposed class, as moot.

## Factual Background

The following facts, taken from plaintiff's complaint, are accepted as true for purposes of the motions to dismiss. See <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

### I.    Berry's Experience at CVRJ

On August 7, 2014, deputies from the Orange County Sheriff's Department arrested Berry and his girlfriend, Pamela Dale Legg, at their home on outstanding warrants. At the time of his arrest, Berry had been addicted to alcohol for over twenty years and heroin for about ten years, and he informed the deputies that he would experience severe withdrawal in jail. When they arrived at CVRJ, Legg also told the deputies that Berry would experience withdrawal symptoms in jail, and that he had to be placed in intensive care the last time he went to jail.

When the deputies transferred Berry to the custody of CVRJ, S.C. Dickson of the Sheriff's Department filled out an "Arresting/Transporting Officer Questionnaire," in which he wrote that Berry "stated he has DT [delirium tremens] real bad." Am. Compl. ¶ 25. CVRJ staff also noted that Berry suffered from asthma, had high blood pressure, and was addicted to alcohol and heroin. According to the complaint, during Berry's interview with CVRJ staff, one officer stated that he did not feel sorry for addicts because "it was a choice they make [sic]." <u>Id.</u> ¶ 27.

At 5:34 p.m. on the day of his arrest, CVRJ staff wrote on Berry's Booking Observation Report: "WILL BE GOING THROUGH WITHDRAWAL/DRUG-HEROIN/ALCOHOL-LIQUIER [sic]/DRUG-2100 hrs 08/06/2014." <u>Id.</u> ¶ 28. By 10:00 p.m. that night, CVRJ staff discovered that Berry had vomited on his jumpsuit and in his bunk. Officer Michael Horrocks wrote in his incident report that Berry was "beginning to go through drug withdrawals." <u>Id.</u> ¶ 42. Thomas Vogt, an Emergency Medical Technician ("EMT") and nurse at CVRJ, also wrote in his incident report that he "found out that Berry was going through heroin withdrawals." <u>Id.</u> ¶ 43.

2

The next morning, Berry had lost track of time and was delusional. CVRJ officers drove Berry to court, but the judge refused to see him because he believed that Berry would vomit in the courtroom. CVRJ staff then transported Berry back to the jail.

Another inmate in the same cell block, referred to in the complaint as "Inmate A," described Berry as "ill-looking" and "unresponsive." Id. at ¶ 48. Inmate A and others requested medical assistance for Berry on a number of occasions; Inmate A believes that he asked for help at least nine or ten times. The complaint alleges that CVRJ employees would sometimes ignore these requests entirely. At other times, Nurse Amanda Pitts and others told Inmate A that if Berry did not personally approach the window to ask for medical assistance, he would receive none. Inmate A advised them that Berry was too sick to leave his bunk. When Inmate A offered to bring a food tray to Berry, because Berry was too sick to retrieve one, CVRJ staff refused.

On or about the morning of August 9, 2014, Inmate A observed Berry go to the toilet, where he vomited and had diarrhea. A half hour later, another inmate assisted Berry back to his bunk. Inmate A asked Berry if he wanted food and water, but Berry was unresponsive. Berry vomited and defecated several more times over the next few hours. Berry was sometimes able to reach the toilet, but he also emitted a strong smell of feces. The complaint alleges that, at the time, CVRJ had a well known, unwritten policy which provided that, if an inmate soiled himself, he would either have to wait until laundry day or personally wash his clothes in the shower. The final time Berry vomited, Inmate A noticed that the vomit was yellow and contained both black particles and fresh blood. Because Berry's vomit had gotten on another inmate's bunk, CVRJ staff cleaned up the mess, pursuant to another well known, unwritten CVRJ policy. At this point, Berry was removed from the cell block and placed in a single cell in the booking area of the jail.

By 10:00 a.m. on August 9, 2014, Berry was very weak, delirious, and severely

3

dehydrated. Because Berry had again soiled his jumpsuit, Officer Jeremy D. Boston assisted

Berry to the shower. Approximately eight minutes later, Boston found Berry lying on the floor of

the shower. Boston noted in his incident report that Berry was "dry heaving and had appeared to

vomit on the floor." Id. ¶ 61. Nurse Christie M. Apple-Figgins wrote in her incident report that

Berry was dry heaving and was "being monitored and treated for possible heroin withdrawals."

Id. She also noted that Berry had refused to come to medical that morning so that the staff could

check his vitals. Approximately three to four hours later, Officer Erin O. LaPanta called Boston

for assistance because Berry had fallen out of his bunk. Both LaPanta and Boston assisted Berry

back into his bed. LaPanta then called for medical staff to take Berry's vitals. Apple-Figgins

arrived, took Berry's vitals, and told LaPanta that Berry was fine. LaPanta noticed dark particles

in Berry's vomit and asked Apple-Figgins what they indicated. Apple-Figgins said that it was old

blood, and that she would get Berry some Gatorade. LaPanta checked on Berry throughout the

day, refilled his Gatorade, and noted that Berry was drinking the Gatorade and "holding it

down." Id. Later, LaPanta again noticed the same "coffee ground" particles in Berry's vomit and

stools. Id. When asked if he was okay, Berry simply replied that he was thirsty. LaPanta then

provided him with more Gatorade.

At 5:20 p.m. on August 9, 2014, Officer Robert J. Counts was asked to assist Berry to the

bathroom. At the time, Berry was "delirious, but conscious." Id. at ¶ 67. As Counts was moving

Berry to the toilet, Berry seemed to have a "fit," his "eyes fluttered," and he was making

"spazming [sic] movements." Id. LaPanta ran her fingernail across the bottom of Berry's foot to

wake him. Five minutes later, Berry woke up and was very confused. Nurse Jasmine Buckner-

Jones arrived, took Berry's vitals, and said that his blood pressure was fine. She then left to call a

doctor. When Berry began to spit up blood, Counts moved Berry to his side in the "recovery

4

position." Id. When the bleeding stopped, Counts then placed Berry on his back. About two minutes later, blood erupted from Berry's mouth. Counts and LaPanta immediately put Berry back on his side and called medical staff. Counts noted in his incident report that Berry did not appear to be breathing at this point. Bucker-Jones called Pitts, told her that Berry was throwing up, and asked if she should call 911; Pitts gave her permission to call emergency services. Berry was pronounced dead at 6:17 p.m. on August 9, 2014. Before calling Berry's family, Superintendent F. Glenn Aylor wrote an email to Dr. William Wilson, in which he stated that "Inmate Berry's death appears to be from a pre-existing medical condition that my medical department was not aware of." Id. at ¶ 70.

The complaint alleges that, at the time of Berry's death, CVRJ had written policies and procedures for treating inmates suffering from alcohol and heroin withdrawal. With respect to alcohol withdrawal, the procedures required CVRJ staff to complete a "CIWA scale" in which each symptom of alcohol withdrawal is measured and assigned a severity score. Id. at ¶ 33. If the inmate had a score of less than 20, the procedures instructed CVRJ staff to monitor the individual. For scores between 20 and 25, CVRJ staff was required to notify the on-call doctor and provide 1-2 mg of the drug Ativan to the inmate. For scores higher than 25, CVRJ staff was required to notify the on-call doctor and administer 2-3 mg of Ativan. If the inmate experienced delirium tremens, the specified treatment was hospitalization. For inmates suffering from heroin withdrawal, CVRJ procedures included obtaining a drug history, doing a "neuro check," and taking an inmate to the hospital if the inmate was "unconscious, obtunded, non-ambulatory, or [] appear[ed] to be in a state of emergency." Id. at ¶ 38. Thornhill argues that defendants did not follow CVRJ's internal protocols for alcohol and heroin withdrawal when they treated Berry.

In light of the foregoing, Thornhill alleges that defendants failed to: (1) recognize Berry's

imminent likelihood of withdrawal, (2) identify the risk of Berry's impaired swallowing due to his severe vomiting, but continued to give him liquid and pills by mouth, (3) accurately assess Berry's vital signs, (4) reassess Berry for instability during each shift, (5) recognize the signs and symptoms of deficient fluid volume and hypovolemic shock, (6) treat seizure symptoms and recognize ineffective breathing pattern, (7) recognize and treat severe withdrawal symptoms, (8) assess the risk for bleeding, and (9) treat the symptoms of gastrointestinal bleeding.

## II.     **Other Inmate's Experience at CVRJ**

In addition to the circumstances surrounding Berry's death, the complaint describes a "pattern and practice of deliberate indifference to inmates' medical needs" at CVRJ. Id. at ¶ 71.

### a.  *Victoria Jenkins*

Victoria Jenkins was an inmate at CVRJ in October of 2014. At the time of her detention, Jenkins took several medications to treat her mental illnesses. However, CVRJ staff refused to give Jenkins her medication and Buckner-Jones told Jenkins that she "better get used to it" because she was "not getting the medication [her] doctor prescribed." Id. at ¶ 83. When Jenkins' sister called CVRJ, she spoke to Buckner-Jones and Pitts who said that they "hadn't had time to get [the medication] to [Jenkins] yet." Id. at ¶ 86. Her sister also contacted Jenkins' doctor, who instructed CVRJ staff to administer Jenkins' medication, which they failed to do. Jenkins' mental health deteriorated to the point where she had to be hospitalized at Western State Hospital. After she was discharged from the hospital on December 3, 2014, Jenkins began receiving her medication, and her mental condition stabilized.

### b.  *Inmate A*

In 2006, Inmate A suffered a back injury that required him to take both pain medication and muscle relaxers. At first, CVRJ staff refused to give Inmate A any medication, but they

6

eventually provided over-the-counter pain medications to him. At the time, Inmate A also suffered from Crohn's disease, which was aggravated by pain medications containing ibuprofen or aspirin. Although CVRJ staff knew of Inmate A's condition, he received unidentified pain medications that aggravated his Crohn's disease. Medical staff also refused to verify the types of pain medications Inmate A was receiving.

In addition, the complaint describes an incident in which a correctional officer held Inmate A down on the floor and repeatedly drove his knee into Inmate A's rib cage and lower sides. Shortly after, Inmate A began bleeding from his rectum. He did not receive medical attention despite at least two attempts to request help from the correctional officers.

### c. *Inmate B*

Another inmate, referred to in the complaint as "Inmate B," was incarcerated at CVRJ in 2005. At the time of his detention, Inmate B was prescribed three different psychiatric medications. Each medication required that he take one dose in the morning and one dose at night. However, CVRJ staff gave Inmate B both doses of two of his medications in the morning and both doses of his third medication in the evening. According to the complaint, Inmate B saw CVRJ staff give another inmate's pills with water, although the directions specified that the medication was not supposed to be taken with water. Inmate B also alleges that CVRJ staff was consistently late with administering pills in the evening, which caused several inmates to experience withdrawal symptoms.

### d. *Inmate C*

Another inmate, referred to in the complaint as "Inmate C," was incarcerated at CVRJ in 2011. Inmate C is an elderly man who took two prescription medications for high blood pressure and two prescription medications for gout. However, CVRJ staff refused to give Inmate C his

medications. Three to four days after his release, Inmate C visited his doctor, who told Inmate C that he had a high risk of stroke because he did not take his medications while at CVRJ.

### e. *Former CVRJ EMT*

The complaint also alleges additional mistreatment towards inmates as witnessed by a licensed EMT, who worked at CVRJ for three months beginning in April 2014. First, the complaint states that Pitts reprimanded the EMT for sending inmates to offsite emergency rooms because of the high cost of each visit. In one instance, an inmate suffered repeated head injuries during a fight. The EMT suggested that the inmate be sent to the emergency room for a CT scan. However, either Pitts or Apple-Figgins talked the inmate out of going to the hospital, and then reprimanded the EMT for her suggestion. On another occasion, an inmate attempted suicide. The EMT urged that the inmate be sent off-site for psychiatric treatment. Instead, the EMT was reprimanded, and the inmate received no treatment. Second, CVRJ never provided the EMT with manuals or rules for treating inmates. Third, the EMT believes that it often took two to three days for inmates to receive basic medications, such as Tylenol. Fourth, the complaint alleges that CVRJ regularly refused to treat inmates for opiate withdrawal. Fifth, the EMT asserts that the dentist at CVRJ regularly worked on inmates without numbing them first. Sixth, the EMT reports that the conditions for female inmates at CVRJ were "appalling" because they were "crammed into one of two cells, which were disgusting and stank." Id. ¶ 141. Finally, the EMT notes that the general attitude at CVRJ was that the inmates were considered "scum." Id. at ¶ 142.

In light of these allegations, Thornhill contends that the Authority and Aylor created and facilitated a "culture of deliberate indifference to inmates' serious medical needs[.]" Id. ¶ 145. Thornhill brings claims pursuant to 42 U.S.C. § 1983 and Virginia's wrongful death statute, Virginia Code § 8.01-50 et seq. She seeks compensatory damages in the amount of $2.15 million

8

from the defendants deemed to be "health care providers" pursuant to Virginia Code § 8.01-581.15, compensatory damages in the amount of $10 million from all other defendants, punitive damages in the amount of $350,000.00, and attorneys' fees and costs.

## Procedural History

On June 2, 2015, Thornhill filed the instant action against defendants. The complaint names eleven defendants: Aylor; the Authority; LaPanta, Counts, Boston, Horrocks, and Officer Eric Last (collectively, the "Officer Defendants"); and Apple-Figgins, Bucker-Jones, Vogt, and Pitts (collectively, the "Medical Defendants"). On August 3, 2015, both the Authority and Aylor filed motions to dismiss. On August 27, 2015, Thornhill filed an amended class action complaint against all defendants, in which she asserts the following claims: equitable relief under 42 U.S.C § 1983 against the Authority on behalf of herself and the proposed class (Count I); damages under 42 U.S.C. § 1983 against all defendants on behalf of herself (Count II); and wrongful death in violation of Virginia Code § 8.01-50 (Count III). Defendants, including the Authority and Aylor, then filed separate motions to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on September 21, 2105. That same day, the Authority filed a motion to deny certification of a proposed class. The court held a hearing on the motions on November 16, 2015. The motions have been fully briefed and are ripe for disposition.

## Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive dismissal for failure to state a claim, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In ruling on a

9

12(b)(6) motion, all well-pleaded allegations in the complaint are taken as true and all reasonable factual inferences are drawn in the plaintiff's favor. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). However, "[a]t bottom, a plaintiff must 'nudge [her] claims across the line from conceivable to plausible' to resist dismissal." Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 364-65 (4th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint must contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. Although a complaint need not contain detailed factual allegations, it must contain more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." Id. at 555. In considering a Rule 12(b)(6) motion, the court may consider exhibits attached to or referred to in the complaint. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999).

## Discussion

### I. Motions to Dismiss

The factual allegations and arguments set forth in the various motions to dismiss vary depending on the claims in the complaint and category of defendants. As such, the court will consider each count in turn.

#### a. Counts I and II: Deliberate Indifference to Serious Medical Needs Under § 1983

In the complaint, Thornhill pleads two counts pursuant to 42 U.S.C. § 1983. Count I is a claim for equitable relief against the Authority from Thornhill individually and on behalf of the proposed class. In Count I, Thornhill alleges that the Authority acted with deliberate indifference to inmates' serious medical needs by failing to enforce it own written policies for medical treatment of inmates, creating unwritten policies that allowed for refusal of medical care, and

10

prioritizing saving money over providing basic medical care. Count II is Thornhill's individual claim for damages against all defendants based on their alleged deliberate indifference to Berry's serious medical need, particularly his symptoms of alcohol and heroin withdrawal.

To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Thornhill argues that the defendants violated Berry's rights under the Due Process Claim of the Fourteenth Amendment by acting with deliberate indifference to his serious medical need.[1] In the Fourth Circuit, deliberate indifference to a pretrial detainee's serious medical need violates the Fourteenth Amendment. Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992). Therefore, the court finds that the complaint contains a plausible right secured by the Constitution. In their motions, defendants also argue that the complaint fails to state claims upon which relief can be granted under § 1983, and that they are entitled to qualified immunity.

### i. *Municipal Liability*

In the complaint, Thornhill argues that there was a policy or custom at CVRJ of deliberate indifference to inmates' serious medical needs in violation of § 1983. Specifically, the complaint states that both the Authority and Aylor fostered a "culture of deliberate indifference to inmates' serious medical needs" and "created and condoned well-known informal policies

---

[1] Plaintiff also alleges that the defendants' conduct violated Berry's rights under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). However, because it appears that Berry was a pretrial detainee at the time of the events in question, the Eighth Amendment does not apply. Instead, Thornhill's claims pertaining to Berry's care and treatment arise solely under the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). Nonetheless, a pretrial detainee's rights are "co-extensive" with a convicted prisoner's rights under the Eighth Amendment. Turner v. Knight, 121 F. App'x 9, 13 (4th Cir. 2005) (citing Hill v. Nicodemus, 979 F.2d 987, 990-92 (4th Cir. 1992)).

11

designed to deny medical care[.]" Am. Compl. ¶¶ 145-46.[2]

Local governing bodies may be sued directly under § 1983 for monetary, declaratory, or injunctive relief when an unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690 (1978). This standard, however, is not akin to respondeat superior liability. City of Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985). In addition, municipal entities may be liable if a governmental "custom" causes a constitutional violation, even if the custom was not formally approved by the entity. Monell, 436 U.S. at 690. In order to survive a motion to dismiss, the plaintiff must plausibly allege (1) the existence of an official policy or custom, (2) that is fairly attributable to the municipal entity, and (3) proximately caused the underlying constitutional violation. Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994). At the motion to dismiss stage, "[t]here is no requirement that [plaintiff] detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." Jordan ex rel. Jordan, 15 F.3d at 339.

The first inquiry in this analysis is whether the complaint plausibly states an official policy or custom. A plaintiff may identify an official policy in three ways: (1) written ordinances and regulations, (2) certain affirmative decisions of policymaking officials, or (3) certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) "[O]utside of formal decisionmaking channels, a municipal custom may arise if a practice is so persistent and

---

[2]    Although Thornhill appears to allege both supervisory liability and municipal liability against Aylor, different legal principals govern each theory of liability. Dowdy v. Pamunkey Reg'l Jail Auth., No. 3:14-cv-003, 2014 WL 2002227, at *8 (E.D. Va. May 15, 2014). Therefore, the court will address Aylor's supervisory liability in the next section.

widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. (internal quotation marks omitted). Thornhill does not allege that any formal, written policy caused Berry's constitutional violations. Instead, she argues that both the Authority and Aylor "refused to enforce compliance with CVRJ's written policies governing inmate medical care" and "created or condoned well-known informal policies designed to deny adequate medical care[.]" Am. Compl. ¶ 146.

The court finds that the complaint contains sufficient factual allegations to support the claim that there was an official policy of deliberate indifference at CVRJ, specifically based on Aylor's inactions as its policymaker. "[D]eliberate indifference of a 'policymaker' may render liable both the official, in his individual capacity, and the municipal entity." Newbrough v. Piedmont Reg'l Jail Auth., 822 F. Supp. 2d 558, 585 (E.D. Va. 2011). In order to attribute an official's actions to the municipality, a plaintiff must plausibly allege that the official was a policymaker for the purposes of § 1983. In order words, the plaintiff must plead facts from which the court can reasonably infer that the official's "edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694. "Policymaking authority" means "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84 (1986)). The most critical factor is not "the practical finality of an official's 'acts and edicts,' but their 'policy' nature." Id. (quoting Pembaur, 475 U.S. at 480).

In this case, the court finds that the complaint plausibly alleges that Aylor was a policymaker at CVRJ, and defendants do not contend otherwise. The amended complaint asserts that Aylor had the "ultimate power and control over the medical care and attention, if any,

13

provided to the inmates at CVRJ" and that he "created and facilitated a culture of deliberate indifference to inmates' serious medical needs[.]" Am. Compl. ¶¶ 5, 145. Thornhill's characterization of Aylor's authority borders on conclusory and, thus, need not be accepted as true. See Newbrough, 822 F. Supp. 2d at 586 (finding that plaintiff stated a plausible claim that the jail's superintendent was its policymaker because the superintendent oversaw the "creation and implementation of [the jail's] policies, procedures, and customs with regard to the provision of medical care"). However, at this stage in the ligation, the court can reasonably infer that, as the highest-ranking officer at CVRJ, Aylor's acts and edicts constituted official policy. Id.

The court also believes that Aylor's alleged inactions constituted deliberate indifference to the rights of detainees. First, the complaint alleges that Aylor prioritized finances over providing adequate medical care to inmates. Second, Aylor took no action when contacted by Jenkins' family members regarding her condition. Third, when the former EMT confronted Aylor about the inhumane treatment of inmates, he simply said that she should stay and would soon act like the rest of the staff. Fourth, Aylor did not enforce compliance with CVRJ's internal written policies governing inmate medical care. Fifth, CVRJ's medical staff refused to treat inmates who did not personally request medical assistance, according to certain informal policies that were allegedly created by Aylor. Finally, Aylor blamed Berry for his own death and stated that it was not Berry's "first rodeo." Am. Compl. ¶ 70. Although the complaint does not explicitly allege that Aylor failed to adequately train his employees, an entity may have a "policy of not taking reasonable steps to train its employees" when the "need for more or different training is so obvious[.]" City of Canton v. Harris, 489 U.S. 378, 390 (1989). Here, based on the Medical Defendants' inadequate treatment of Berry's serious withdrawal symptoms, the complaint arguably alleges the existence of an "obvious" need for improved training at CVRJ.

Such an alleged failure also states a viable claim of deliberate indifference on Aylor's part as the policymaker for CVRJ. Therefore, the court believes that a fair reading of the complaint supports claims of deliberate indifference to inmates' serious medical needs both to Aylor, in his individual capacity, and to the Authority, such as to survive the motions to dismiss.

Even if the court could find that the complaint does not sufficiently allege a policy of deliberate indifference at CVRJ, the court believes that the complaint also cites sufficient facts in support of the notion that there was a custom of deliberate indifference to inmates' serious medical needs at CVRJ. A custom may be attributable to a municipality when the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Newhard v. Borders, 649 F. Supp. 2d 440, 446 (W.D. Va. 2009). Actual knowledge may be shown by "recorded reports to or discussions by a municipal governing body." Id. at 446 n.4. Constructive knowledge may be shown with facts that the practices have been so "widespread and flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id.

Although a "meager history of isolated incidents" does not establish a custom, Carter, 164 F.3d at 220, the complaint contains a number of alleged instances of deficient medical care at CVRJ, evidenced by both the events surrounding Berry's death and the alleged mistreatment of other inmates. The allegations in this case are not "scattershot accusations of unrelated constitutional violations" but, instead, all relate to deficient medical care in violation of the Eighth and Fourteenth Amendments. Carter, 164 F.3d at 218. First, Thornhill contends that Pitts and another medical employee told Inmate A that if Berry did not approach the window to ask for medical assistance, he would receive none. This appeared to be the rule at CVRJ even though

15

Berry was too sick to leave his bunk. Similarly, the complaint alleges that if an inmate was not present at the window when CVRJ staff distributed medication and food trays, then he was marked as "refusing" medication and food. CVRJ staff reiterated this policy when Inmate A asked if he could bring a food tray to Berry, as he was too sick to collect his own. In addition, Inmate A was accused of refusing his medication when he asked medical staff to verify his over-the-counter pain medications. Moreover, according to the complaint, the Authority sought to keep operating costs low by denying proper medical treatment to inmates. Specifically, the complaint alleges that Pitts and/or Apple-Figgins reprimanded medical staff when inmates were sent to off-site emergency rooms, and even when medical staff merely suggested off-site medical treatment. The complaint also states that CVRJ staff would regularly deny treatment to inmates suffering from opiate withdrawal symptoms. Finally, the EMT contends that it would often take two or three days for inmates to receive basic medications, like Tylenol. Based on the allegations in the complaint, there also appeared to be a custom at CVRJ of denying inmates access to medications, even if the inmates had a prescription for the medication prior to arriving at CVRJ. This custom was reiterated by Jenkins, Inmate A, Inmate B, and Inmate C. Most importantly, the complaint cites instances in which Aylor was personally aware of the lack of medical care provided to inmates, constituting actual knowledge of the custom. As such, the court finds that the complaint also plausibly alleges a custom of deliberate indifference at CVRJ.

Next, "[i]t is not enough to identify a policy or custom of deliberate indifference; [p]laintiff must also allege that the policy or custom proximately caused the instant constitutional injury." Newbrough, 822 F. Supp. 2d at 584. The policy or custom must be "the moving force of the constitutional violation specifically charged." Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984) (internal quotation marks omitted). There is a causal connection

16

between a policy or custom and the specific constitutional violation if the violation was made "reasonably probable by permitted continuation of the custom[.]" Spell, 824 F.2d at 1391.

In this case, the court finds that the complaint alleges sufficient facts to conclude that a policy or custom of deliberate indifference at CVRJ violated Berry's constitutional rights. Specifically, "there is a logical and natural connection between a policy or custom of deficient medical care and an instance of inadequate medical care." Newbrough, 822 F. Supp. 2d. at 585. Again, Thornhill has sufficiently alleged an official policy or custom of deficient medical care at CVRJ. The court finds that there is a logical and natural connection between these allegations and the instances in which Berry received allegedly deficient medical care in violation of the Fourteenth Amendment. For purposes of the motions to dismiss, it is therefore reasonable for the court to conclude that the policies or customs of deliberate indifference were the moving force behind the constitutional violations alleged in the complaint.

Viewing the facts in a light favorable to the plaintiff, the court finds that Thornhill has stated a plausible claim that there was an official policy or custom at CVRJ of deliberate indifference to Berry's serious medical needs in violation of the Fourteenth Amendment. Thus, at this stage in the litigation, the court concludes that Thornhill has stated plausible claims of deliberate indifference under § 1983 against both the Authority, under the theory of municipal liability, and against Aylor as policymaker of CVRJ. Accordingly, both the Authority's and Aylor's motions to dismiss are denied under the theory of municipal liability.[3]

---

[3] However, for the reasons set forth in the class certification section below, the court will grant the Authority's motion to deny class certification. As such, only Thornhill's individual claim for equitable relief remains under Count I. Nevertheless, the Fourth Circuit has held that an inmate's claim for injunctive or declaratory relief is moot when he is "no longer subject to the challenged policy, practice, or condition ... even if a claim for money damages survives." Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007). Therefore, Count I will be dismissed as moot as Berry is no longer subject to the challenged policies or customs.

ii. **_Supervisory Liability_**

In addition to liability as the policymaker for the Authority, the complaint also appears to assert that Aylor is liable under § 1983 in his individual capacity as the supervisor of CVRJ. See Am. Compl. ¶ 65 ("[U]nder Aylor's command of CVRJ, it was (and remains) an impermissible drain on the budget of CVRJ and the CVRJ counties to provide proper medical care to CVRJ inmates."). A supervisor is not automatically liable for the misconduct of his employees under principles of respondeat superior, Monell, 436 U.S. at 694, but may be liable for "constitutional injuries inflicted by [his] subordinates" in certain circumstances, Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). Specifically, "continued inaction in the face of widespread abuses … provides an independent basis for finding that [the official] was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. To establish supervisory liability, a plaintiff must show (1) that "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) that the supervisor's response was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there existed "an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Shroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations and quotation marks omitted).

In this case, the court first finds that Thornhill has adequately alleged facts that, taken as true, give rise to the inference that Aylor had actual or constructive knowledge of the inadequate medical care at CVRJ. Thornhill need not show that Aylor had actual or constructive knowledge of the circumstances surrounding Berry's treatment, but simply the risk of harm to inmates like Berry. Newbrough, 822 F. Supp. 2d at 587. In the complaint, Thornhill alleges that, on at least

18

two instances, Aylor was personally aware of deficient medical care to inmates. Thus, the court finds that the first prong of the Shaw test is satisfied.

For the second prong, Thornhill need only allege inaction by Aylor to support a reasonable inference of deliberate indifference. Here, the court may reasonably infer that Aylor was deliberately indifferent to instances when inmates received inadequate medical care, for the same reasons as outlined in the previous section regarding Aylor's liability as policymaker of CVRJ. The complaint goes beyond merely "pointing to a single incident or isolated incidents" to show Aylor's inadequate response. Slakan, 737 F.2d at 373. Instead, the complaint contains several instances where Aylor failed to take action to remedy the lack of medical care provided to inmates, showing "tacit authorization of offensive practices." Id.

Finally, for the same reasons stated in the previous section regarding municipal liability, Thornhill has plausibly stated a causal nexus between the alleged practices at CVRJ and Berry's death. As superintendent of CVRJ, Aylor had ultimate authority and control over the medical care provided to inmates. It is reasonable to conclude that the deprivation of Berry's constitutional rights was a "natural and foreseeable consequence" of Aylor's approval of, or inaction towards, deficient medical care provided to inmates. Newbrough, 822 F. Supp. 2d at 587. Therefore, Aylor's motion to dismiss is denied with respect to Count II of the complaint.

### iii. *Staff Defendants*

In Count II, Thornhill also alleges the individual staff members at CVRJ were deliberately indifferent to Berry's serious medical need. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). As such, the defendants' actions must be "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v.

19

Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Deliberate indifference requires a "showing that the defendants <u>actually knew of</u> and <u>disregarded</u> a substantial risk of serious injury to the detainee or they <u>actually knew of</u> and <u>ignored</u> a detainee's serious need for medical care." <u>Parrish v. Cleveland</u>, 372 F.3d 294, 302 (4th Cir. 2004) (internal citation and quotation marks omitted) (emphasis in original).

A plausible denial-of-medical-care claim under § 1983 has both objective and subjective prongs. Under the objective prong, a plaintiff must allege an objectively "serious medical need." <u>Johnson v. Quinones</u>, 145 F.3d 164, 167 (4th Cir. 1998). A serious medical need is one that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008) (internal citation omitted). Several courts have found that symptoms of alcohol and drug withdrawal qualify as a serious medical need. <u>See, e.g.</u>, <u>Boren v. Nw. Reg'l Jail Auth.</u>, No. 5:13cv013, 2013 WL 5429421, at *9 (W.D. Va. Sept. 30, 2013) (alcohol withdrawal); <u>Mayo v. Cty. of Albany</u>, 357 F. App'x 339, 341-42 (2d Cir. 2009) (heroin and alcohol withdrawal); <u>Sylvester v. City of Newark</u>, 120 F. App'x 419, 423 (3d Cir. 2005) (drug withdrawal); <u>Foelker v. Outagamie Cty.</u>, 394 F.3d 510, 513 (7th Cir. 2005) (methadone withdrawal). As such, the court concludes that the complaint adequately alleges that Berry's alcohol and heroin withdrawal presented a serious medical need. The remaining question is whether Thornhill has adequately stated a plausible claim for deliberate indifference to Berry's serious medical need under the subjective prong of the analysis.

The subjective prong requires two showings. First, the defendant must have subjectively recognized a substantial risk of harm. "It is not enough that the [employees] should have recognized it; they actually must have perceived the risk." <u>Id.</u> at 303 (quoting <u>Rich v. Bruce</u>, 129

20

F.3d 336, 340 n.2 (4th Cir. 1997)). Second, the defendant must have subjectively recognized that his actions were "inappropriate in light of that risk." Id. Again, it is not enough that the defendant should have recognized the inappropriateness of his actions. Id. (citing Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001)). For that reason, a jail employee is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

### 1. Officer Defendants

Thornhill alleges that the Officer Defendants were deliberately indifferent to Berry's symptoms of alcohol and heroin withdrawal. As non-medical staff members, the Officer Defendants "cannot be liable for the medical staff's diagnosis decisions." Wade v. Carter, No. 2:13cv00026, 2014 WL 3058562, at *7 (W.D. Va. Jul. 2, 2014) (quoting Meloy v. Bachmier, 302 F.3d 845, 849 (8th Cir. 2002)). Instead, they were entitled to rely on the judgment and expertise of the medical professionals who provided care to Berry. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir.1995) (citing Miltier, 896 F.2d 848, 854 (4th Cir.1990)); see also Arnett v. Webster, 658 F.3d 742, 755 (7th Cir.2011) ("Non-medical defendants ... can rely on the expertise of medical personnel. We have previously stated that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). However, non-medical prison employees may act with deliberate indifference if they were "personally involved with a medical treatment, deliberately interfered with prison medical personnel's treatment, or tacitly authorized or [were] indifferent to the prison medical personnel's misconduct." Boren, 2013 WL 5429421, at *10.

In this case, the court concludes that Thornhill has failed to state a plausible claim that the Officer Defendants were deliberately indifferent to Berry's serious medical need. First, the

complaint does not allege any facts from which the court can reasonably conclude that Last and Horrocks subjectively recognized a substantial risk of harm to Berry. The complaint only states that Last was employed by CVRJ at the time of Berry's death; the complaint does not contain a single allegation that he knew of Berry's condition, let alone any substantial risk of harm to Berry. With respect to Horrocks, the complaint only provides that, after Berry vomited during his first night at CVRJ, Horrocks noted in his incident report that, "I was told [Berry] was beginning to go through drug withdrawals." Am. Compl. ¶ 42. Standing alone, these facts do not indicate that Horrocks was aware of any substantial risk of harm to Berry.

Second, the complaint fails to show that any of the other Officer Defendants, who subjectively knew of the substantial risk of harm to Berry due to his symptoms of alcohol and heroin withdrawal, knew that their actions were inappropriate in light of that substantial risk. Prison staff who actually knew of a substantial risk to an inmate's health or safety "may be found free from liability if they respond[] reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844.

With respect to LaPanta, the complaint states that she assisted Berry when he fell out of his bunk, checked on him during the day, gave him more Gatorade when he said he was thirsty, and called the medical staff when Berry's condition deteriorated. Although LaPanta noticed that Berry had particles that resembled coffee grounds in his vomit, she was entitled to rely on Apple-Figgins' determination that Berry was fine. With respect to Counts, the complaint provides that he assisted Berry when he was found lying on the floor near the shower, and he was present when Berry had a seizure. Again, Counts was entitled to rely on the medical opinions of Apple-Figgins and Buckner-Jones, who both said that Berry was fine after checking his vitals. Nothing in the complaint suggests that Counts was subjectively aware that his actions were inappropriate

in light of the substantial risk of harm to Berry. Finally, with respect to Boston, the complaint states that he assisted Berry both after Berry soiled his jumpsuit and after Berry fell out of his bunk. Boston was also present when the Medical Defendants arrived, took Berry's vitals, and stated that he was fine. Once again, Boston was entitled to rely on the Medical Defendants' diagnosis as a non-medical officer. Finally, there are no allegations that any of the Officer Defendants denied, delayed, or intentionally interfered with Berry's medical treatment, or were indifferent to misconduct by the Medical Defendants. Overall, the facts alleged in the complaint show that the Officer Defendants acted reasonably and documented their observations, even though the risk of harm to Berry was not ultimately averted. Therefore, Thornhill has failed to state a plausible claim that the Officer Defendants were deliberately indifferent to Berry's serious medical need in violation of § 1983. Accordingly, the court will grant the Officer Defendants' motions to dismiss with respect to Count II.

### 2. Medical Defendants

Thornhill also claims that the Medical Defendants were deliberately indifferent to Berry's serious medical needs. Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs[.]" Estelle, 429 U.S. at 104-05. However, a lapse in professional judgment does not amount to deliberate indifference. Farmer, 511 U.S. at 844; see also Estelle, 429 U.S. at 106 (stating that physician negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). In addition, mere disagreement with medical personnel with respect to a course of treatment is insufficient to demonstrate deliberate indifference. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)).

In this case, the court finds that the complaint sets forth a plausible claim that the Medical

Defendants, with the exception of Vogt,[4] were deliberately indifferent to Berry's serious medical needs. The Medical Defendants argue that Berry received medical treatment while he was at CVRJ, and that Thornhill has pled ordinary negligence at most. However, a claim for deliberate indifference does not require that a plaintiff allege that he was "literally ignored." Badu v. Broadwell, 5:11-CT-3192-F, 2013 WL 286262, at *5 (E.D.N.C. Jan. 24, 2013) (citing Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010)). Instead, a medical professional's decision to employ the "easier and less efficacious treatment" for an objectively serious medical need can show deliberate indifference. Boren, 2013 WL 5429421, at *9 (quoting Berry, 604 F.3d at 441).

While Berry was at CVRJ, the Medical Defendants took his vitals, gave him Gatorade, provided him with medication for nausea and diarrhea, and monitored his condition. Although the Medical Defendants may ultimately prove that this was a "mere tragic case of misdiagnosis," this cursory level of treatment for Berry, despite multiple reports of his deteriorating condition, is sufficient to support an inference that the Medical Defendants acted with deliberate indifference. Newbrough, 822 F. Supp. 2d at 579. In fact, this court has previously found a plausible claim for deliberate indifference based on similar treatment provided to an inmate suffering from alcohol withdrawal and seizures. Boren, 2013 WL 5429421, at *9. Moreover, the Fourth Circuit has held that a medical professional's failure to follow up on a prescribed course of treatment may give rise to a claim of deliberate indifference. See Miltier, 896 F.2d at 853 (denying summary judgment for a doctor who "did nothing to follow up" despite the detainee's "continued complaints"). Here, although the complaint states that Berry did receive Gatorade and medication, none of the Medical Defendants checked to make sure that Berry was able to ingest

---

[4]     The only allegation against Vogt is that he wrote in his incident report that, "We went to medical and found that [Inmate] Berry was going through heroin withdrawals." Am. Comp. ¶ 43. There are no facts, however, that Vogt was involved in providing medical treatment to Berry. Therefore, the court finds that the complaint does not state a plausible claim of deliberate indifference against him.

24

the liquid or pills. Moreover, when Berry's condition worsened despite this treatment, none of the Medical Defendants suggested a different course of action, but instead remarked that Berry was "fine." Am. Compl. ¶¶ 63, 67. Thus, at this stage of the litigation, taking the facts alleged in the complaint in the light most favorable to Thornhill, the court concludes that she has stated a plausible claim of deliberate indifference in violation of § 1983 against the Medical Defendants, with the exception of Vogt. Accordingly, Vogt's motion to dismiss will be granted whereas the other Medical Defendants' motions to dismiss will be denied with respect to Count II.

### iv. *Qualified Immunity*

Aylor and the Medical Defendants argue that, even if Thornhill has pled plausible claims of deliberate indifference, they are entitled to qualified immunity in their individual capacities. Government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the court must "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right." Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

In this case, the constitutional right at issue is due process under the Fourteenth Amendment. As previously noted, it is also clearly established that deliberate indifference to a pretrial detainee's serious medical need is a violation of the Fourteenth Amendment. Gordon, 971 F.2d at 1094; see also Hill v. Nicodemus, 979 F.2d 987, 990 (4th Cir. 1992). Assuming the facts in the complaint, the court concludes that reasonable officials in Aylor's and the Medical

25

Defendants' positions would have understood that their actions or omissions violated Berry's due process rights. See Estate of Harvey ex rel. Dent v. Roanoke City Sheriff's Office, No. 7:06CV00603, 2007 WL 602091, at *6 (W.D. Va. Feb. 23, 2007) (holding that qualified immunity was inappropriate where plaintiff alleged deliberate indifference to an inmate's serious medical need under the Fourteenth Amendment). Therefore, qualified immunity is inappropriate at this stage of the litigation.

In sum, the court finds that Thornhill has stated plausible claims under § 1983 against the Authority, Aylor, and most of the Medical Defendants. Accordingly, with respect to Counts I and II of the amended complaint, the court will grant the motions to dismiss filed by the Officer Defendants and Vogt. The other individual defendants' motions to dismiss will be denied.

### b. **Count III: Wrongful Death**

Count III of the complaint alleges violations of Virginia's wrongful death statute, Virginia Code § 8.01-50, et seq. The statute provides that whenever the death of a person is caused by "the wrongful act, neglect, or default of any person or corporation" that person or corporation shall be liable for damages. Va. Code Ann. § 8.01-50. "[T]he wrongful death statute [is] the exclusive statement of the grievances that Virginia will recognize when a tort victim dies of [his] injuries." El-Meswari v. Wash. Gas Light Co., 785 F.2d 483, 491 (4th Cir. 1986). A plaintiff may bring a wrongful death claim simultaneously with a claim under § 1983, when such claims arise out of the same conduct. Miltier v. Beorn, 696 F. Supp. 1086, 1089 (E.D. Va. 1998).

By virtue of the complaint's plausible claim of deliberate indifference, the court concludes that the complaint states a plausible claim under Virginia's wrongful death statute

26

against the Authority, Aylor, and the Medical Defendants, with the exception of Vogt.[5]

Defendants argue that the complaint does not show that a wrongful act, neglect, or default caused

Berry's death. However, because deliberate indifference requires a showing of "something more

than mere negligence," the court concludes that the complaint alleges facts that plausibly show

that Berry's death was caused by a wrongful act, neglect, or default because it plausibly states a

claim of deliberate indifference. Grayson, 195 F.3d at 695; Brown v. Mitchell, 308 F. Supp. 2d

682, 701 (E.D. Va. 2004) (finding that the failure to remedy overcrowding at a local jail may be

considered "deliberate indifference" under the Eighth Amendment or "gross negligence" under

Virginia's wrongful death statute).

Defendants also argue that they are entitled to sovereign immunity with respect to

Thornhill's claims of ordinary negligence in Count III.[6] However, it is well-established that state

officials are not entitled to sovereign immunity when they are accused of an intentional tort or

acts constituting gross negligence. See, e.g., Coppage v. Mann, 906 F. Supp. 1025, 1047 (E.D.

Va. 1995); Burnham v. West, 681 F. Supp. 1169, 1172 (E.D. Va. 1988); Nat'l R.R. v. Catlett

Volunteer Fire Co., Inc., 404 S.E.2d 216, 219 n.2 (Va. 1991); Tomlin v. McKenzie, 468 S.E.2d

882, 884 (Va. 1996). Again, by plausibly alleging deliberate indifference, Thornhill has shown

---

[5]        The court also finds that Thornhill has failed to state a plausible claim of wrongful death against the Officer Defendants because Thornhill has not forecast any evidence to show that the Officer Defendants neglected Berry. In fact, under the allegations of the complaint, the Officer Defendants assisted and checked on Berry several times during his detention. More importantly, the crux of Thornhill's wrongful death claim is based on the inadequate medical treatment he received. The complaint does not plausibly allege that providing medical treatment is a duty of the Officer Defendants. The complaint simply recites the elements of negligence against the Officer Defendants without any plausible facts to support the claim. This showing cannot withstand a 12(b)(6) motion. Therefore, Thornhill's wrongful death claim fails against the Officer Defendants.

[6]        Defendants note that there is disagreement in this Circuit as to whether a Virginia regional jail constitutes a municipal corporation for which sovereign immunity is available. Compare Dowdy, 2014 WL 2002227, at *4 (holding that the Pamunkey Regional Jail Authority is equivalent to a municipal corporation and, therefore, its employees may be entitled to sovereign immunity), with Boren, 2013 WL 5429421, at *5 (holding that the Northwestern Regional Jail Authority may not be treated as a municipal corporation). Because the court finds that Thornhill has sufficiently alleged intentional and/or grossly negligent acts by defendants, for which sovereign immunity does not apply, the court need not decide whether the Authority may be treated as a municipal corporation at this stage.

27

more than mere negligence by the Authority, Aylor, and the Medical Defendants Therefore, the court is unable to conclude that they are entitled to sovereign immunity at this stage in the proceedings.

Thus, the court concludes that Thornhill has stated a plausible claim under Virginia's wrongful death statute against the Authority, Aylor, and the Medical Defendants, with the exception of Vogt. Accordingly, the court will grant the Officer Defendants' and Vogt's motions to dismiss with respect to Count III of the complaint. The remaining defendants' motions to dismiss will be denied with respect to this count.

In sum, the following claims will proceed in this case: (1) Count II against the Authority, Aylor in his individual capacity, Apple-Figgins, Buckner-Jones, and Pitts; and (2) Count III against the Authority, Aylor in his individual capacity, Apple-Figgins, Buckner-Jones, and Pitts.

III.   **Motion to Deny Class Certification**

The court must next decide whether to deny class certification, as sought in Count I of the complaint. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Thornhill seeks to represent a class of "all persons who have been, or may be, harmed by the acts and practices alleged [in the complaint]." Am. Comp. ¶ 150. Rule 23(a) requires the following prerequisites for the court to certify a class: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P.  23(a). In addition, the proposed class representative must demonstrate at least one of the three requirements listed in Rule 23(b). <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2548 (2011). In this case, Thornhill seeks certification under Rule 23(b)(2), which is proper only when

the declaratory and injunctive relief sought predominates the monetary relief sought. Fed. R. Civ. P. 23(b)(2). The plaintiff bears the burden of showing these prerequisites, Monroe v. City of Charlottesville, Va., 579 F.3d 380, 384 (4th Cir. 2009), cert. denied, 130 S. Ct. 1740 (2010), and must do more than plead compliance with Rule 23 requirements, EQT Prod. Co v. Adair, 764 F.3d 347, 358 (4th Cir. 2014).

As a preliminary matter, Thornhill argues that the Authority's motion to deny class certification is premature, as the parties have not yet engaged in discovery. See Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1268 (4th Cir. 1981) (finding that "it is essential that a plaintiff be afforded a full opportunity to develop the record containing all the facts pertaining to the suggested class and its representatives" before ruling on class certification); see also Doctor v. Seaboard C.L.R. Co., 540 F.2d 699, 707 (4th Cir. 1976) (finding that a decision on class certification "usually should be predicated on more information than the complaint itself affords"). However, if the court finds that discovery will not overcome the deficiencies in the putative class, denial of class certification is proper before discovery. Peltier v. Exxon Corp., 527 F.2d 757, 760 (9th Cir. 1975). In such cases, the complaint will demonstrate as a matter of law that plaintiffs cannot meet the requirements for maintaining a class action. Boyce v. Wachovia Secs., LLC, No. 5:09-CV-263, 2010 WL 1253737, at *4 (E.D.N.C. Mar. 29, 2010). Therefore, the court must determine whether the complaint plausibly raises potential class claims. Id.

When construed in the light most favorable to Thornhill, the complaint alleges that defendants were deliberately indifferent to inmates' serious medical needs in violation of § 1983. Specifically, the complaint states that defendants engaged in a pattern and practice of denying inmates proper medical treatment and prioritized saving money over providing reasonable

29

medical care. However, based on the circumstances alleged in the complaint and the definition of the proposed class, the court cannot conclude that Thornhill has plausibly alleged facts such as would support maintenance of a class action.

Even if the court could find that Thornhill has plausibly met the requirements of numerosity, typicality, and adequacy of the class representative, the court is constrained to conclude, as a matter of law, that commonality is lacking in this case. The United States Supreme Court has held that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury, … [which] does not mean merely that they have all suffered a violation of the same provision of law." Dukes, 131 S. Ct. at 2551. In other words, commonality "must depend upon a common contention … of such nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. Before and after the Supreme Court's decision in Dukes, district courts have certified classes of incarcerated persons challenging specific, written, acknowledged, or official policies. See, e.g., Logory v. Cty. of Susquehanna, 277 F.R.D. 135, 142 (M.D. Pa. 2011) ( "[C]ommonality is high as each was subjected to the very same delousing procedure."); Bumgarner v. N.C. Dep't of Corr., 276 F.R.D. 452, 456–57 (E.D.N.C. 2011) (finding commonality among class members challenging sentence-reduction credit programs that by operation exclude disabled inmates unable to work); Tyler v. Suffolk Cnty., 253 F.R.D. 8, 10 (D. Mass. 2008) (finding commonality among class members asserting that "the system of bathroom access under which Building 4 operated is per se a violation of their Eighth Amendment rights" and noting that "all members of the putative class in the instant case were subject to the same allegedly unlawful policies and, as such, their claims share common questions of law and fact"); Hilton v. Wright, 235 F.R.D. 40, 52 (N.D.N.Y. 2006)

(finding commonality among a class challenging a prison-wide agency policy requiring that inmates with Hepatitis C complete a substance abuse program to become eligible for medical treatment).

In this case, Thornhill cannot meet her burden of showing commonality among the putative class members. The complaint contains plausible claims that certain defendants were deliberately indifferent to Berry's serious medical need, specifically alcohol and heroin withdrawal, in violation of the Fourteenth Amendment. However, Thornhill must go beyond simply alleging that the putative class members also suffered violations under § 1983 from lack of adequate medical care. In order to satisfy the standard set forth in <u>Dukes</u>, the complaint must allege that the putative class members suffered the same injury. At this stage, a proposed class of "all persons who have been, or may be, harmed by the acts and practices alleged [in the complaint]" is insufficient, as a matter of law, to establish that the putative class members suffered the same injury. The proposed class would include not only individuals like Berry, who died from allegedly inadequate treatment for alcohol and heroin withdrawal, but all current and future inmates who may receive inadequate medical treatment at CVRJ. Absent the identification of a specific policy or custom that would have been applicable to all putative class members, the wide range of possible medical maladies, treatments, and omissions is too broad for the court to find that there is a common contention that is capable of adjudication in one stroke.

Furthermore, Thornhill has not identified any other instances where an inmate died, or was seriously harmed, as a result of inadequate treatment for symptoms of alcohol or drug withdrawal. Similarly, Thornhill does not allege that a systemic, common policy or custom harmed, or will likely harm, the putative class members—for example, the well known, unwritten policy that inmates personally cannot receive medical attention absent a formal

31

request—but instead refers to a broad range of "practices" in the complaint. Am. Comp. ¶ 150. It is theoretically possible for the court to find that some practices at CVRJ constituted deliberate indifference to certain inmates' serious medical needs, while other practices did not. This prevents the court from finding that the putative class members all suffered the same injury, and that classwide proceedings will "generate common answers apt to drive the resolution of the litigation." Dukes, 131 S. Ct. at 2551. Based on the current parameters of the putative class, and the broad, unrelated allegations in the complaint, the court does not believe that discovery will remedy these deficiencies. Therefore, Thornhill has not plausibly alleged that classwide adjudication is possible in this case and, thus, has failed to show commonality as a matter of law.[7] Accordingly, the court will grant the Authority's motion to deny class certification at this time. As discovery progresses, plaintiff may seek to amend her complaint in this respect should circumstances warrant.

---

[7]     The court notes that this case is distinguishable from Scott v. Clarke, in which this court granted class certification to all current and future inmates at the Fluvanna Correctional Center for Women ("FCCW"). 61 F. Supp. 3d 569, 591 (W.D. Va. 2014). In that case, there were specific policies that allowed the correctional staff at FCCW to override the medical staff's diagnoses and treatments. Id. at 574-75. Moreover, FCCW contracted with an outside contractor to provide medical services at the facility through a fixed-cost model, which arguably encouraged the contractor to administer constitutionally deficient medical care in an effort to increase profits. Id. at 574. Finally, plaintiffs alleged that, on a systemic level, FCCW's own records revealed that it failed to provide oversight, training, and supervision of the contractor, as well as failed to adequately respond to inmates' grievances regarding their medical care. Id. at 576. Overall, the court noted that the inadequacies at FCCW subjected the plaintiffs, as well as the putative class, to an "ongoing substantial risk of serious harm" in violation of the Eighth Amendment. Id. at 583. Specifically, the court noted that "[p]laintiffs' claims of constitutionally deficient medical care do not turn on an individual plaintiff's particular health concerns, but rather … the [] alleged systemic failure to provide a level of medical care to all of its residents that complies with constitutional norms." Id. at 586. As such, the court found that the essential questions in the case did not vary among the class members and, therefore, numerosity was satisfied. Id. at 585.

    Here, although the court believes that Thornhill has sufficiently pled a policy or custom of inadequate medical care at CVRJ with respect to Berry's treatment, the court also concludes that such allegations do not rise to the level of showing a substantial risk of serious harm to the putative class based on "similar practices and under the same legal theory." Id. Thornhill's claim of deficient medical care involve Berry's particular health concerns, namely his drug and alcohol withdrawals, and the complaint fails to demonstrate that the constitutionality of any specific policy or custom is a common question to the putative class. See Gray v. Hearst Commc'ns, Inc., 444 F. App'x 698, 701-02 (4th Cir. 2011) (affirming certification of a class in which "there [was] no dispute that a uniform policy (or obligation) exist[ed] or that such a uniform policy applie[d] to all plaintiffs"); see also Mathis v. Geo Group, Inc., No. 2:08-CT-21-D, 2012 WL 600865, at *6 (E.D.N.C. Feb. 23, 2012) (denying class certification because plaintiff challenges a "constellation of unspecified organizations, systems, policies, procedures, practices, acts, and omissions that allegedly have led to unconstitutional individual deprivations of medical attention" (internal quotation marks omitted)).

## Conclusion

For the foregoing reasons, the court will grant the motions to dismiss filed by LaPanta, Counts, Boston, Horrocks, Last, and Vogt, will grant in part and deny in part the Authority's motions to dismiss, and will deny the remaining defendants' motions to dismiss. The court will also grant the Authority's motion to deny class certification. As such, Berry's individual claim for equitable relief under Count I will be dismissed as moot. In sum, only Counts II and III will go forward against the Authority, Aylor, Apple-Figgins, Buckner-Jones, and Pitts.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This __19th__ day of February, 2016.

Chief United States District Judge