IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 1 8 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

SHERRY LYNN THORNHILL, )
for herself and as Administrator of the )
Estate of her son, Shawn Christopher Berry, )
deceased, individually and on behalf of )
all others similarly situated, )
    )    Civil Action No. 3:15CV00024
    )
      Plaintiff, )
    )    **MEMORANDUM OPINION**
    )
v. )
    )    By: Hon. Glen E. Conrad
    )    United States District Judge
F. GLENN AYLOR, et al., )
    )
      Defendants. )
    )

Plaintiff Sherry Lynn Thornhill, on behalf of herself and as administrator of the estate of her son, Shawn Christopher Berry, filed this action pursuant to 42 U.S.C. § 1983 and Virginia Code § 8.01-50 et seq., against the Central Virginia Regional Jail Authority (the "Authority"), Superintendant F. Glenn Aylor, and three medical employees ("the Medical Defendants") at the Central Virginia Regional Jail ("CVRJ"). The action arises out of Berry's death while experiencing drug and alcohol withdrawal in CVRJ custody. The case is presently before the court on the defendants' motion for summary judgment as to Count II under § 1983 and the defendants' motion to dismiss Count III for wrongful death under Virginia law. For the reasons set forth below, both the motion for summary judgment and the motion to dismiss are denied.

### Factual Background

The following facts are either undisputed or presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## I. CVRJ Policies on Medical Care to Inmates

All CVRJ inmates have Anthem medical insurance. Dep. of Teresa Miller 14-15, Docket No. 105. Each bill from a healthcare provider is negotiated with Anthem down to a contractually allowed amount. Id. at 15. Anthem pays the bill, and the Authority pays Anthem. Id.

The Authority in turn receives payments for medical expenses from five localities that use the facility to house inmates. Dep. of Glenn Aylor 59, Docket No. 104. The localities pay an annual allocation based on a formula, and when the medical expenses for a certain locality exceed the budgeted allocation, the Authority pays the bill and the locality reimburses the Authority. Id. at 78, 80-81.

The medical department of the CVRJ has a written policy manual on providing medical care to inmates. The manual includes a section on inmates undergoing drug and alcohol withdrawal. In that section, the manual lists symptoms of acute withdrawal to include restlessness, lethargy, vomiting, shakes or tremors, convulsions, mental confusion and disorientation, possible bizarre behavior or psychosis, and marked anxiety. CVRJ Medical Policy Manual at 48-49, Docket No. 123-4. Other symptoms of alcohol withdrawal are listed throughout the manual and include an elevated blood pressure, elevated or abnormal pulse rate, tremors, hallucination, a decreased respiratory rate, an altered state of consciousness, nausea, weakness, anorexia, and sweating. Id. at 92, 98-99.

For inmates displaying signs of intoxication, the medical staff is instructed to perform a Clinical Institute Withdrawal Assessment ("CIWA") scale, conduct a "neuro check," record the inmate's vital signs, "and obtain as much information as possible about the drinking habit and history" of the inmate to include the inmate's previous history of detoxification and time of his last drink. See id. at 92. The manual instructs the medical department to report to a physician if

the inmate scores more than 20 on the CIWA scale, appears to have any particularly concerning symptoms such as an incomplete response to care or continuous abnormal vital signs, becomes confused, suffers from persistent vomiting, or receives Phenergan for persistent vomiting because of its potential to decrease the seizure threshold. Id. at 92-93. The protocol for monitoring vital signs requires a check every 15 minutes during severe symptoms, every 2 hours for the first 24 hours, and every 4 hours for the next 2 days. Id. at 93. Late or major withdrawal from alcohol, which is marked by a "clouding of consciousness and delirium" and known as delirium tremens ("DTs"), usually begins about 48 hours after the last drink and requires "Hospitalization!" Id. at 99.

The instructions for managing withdrawal from heroin advise that the signs and symptoms will usually occur within 24 hours of the last dose and include nausea, diarrhea, tremors, an increased appetite, an increased or decreased blood pressure, and "an altered state of mentation." Id. at 141. The medical department is instructed to observe inmates every 15 minutes for level of consciousness, record the inmate's vital signs, obtain detailed information regarding the inmate's drug history, conduct a neuro check on anyone with an altered level of consciousness, report all findings to a physician, and send any individual who appears to be "unconscious, obtunded, non-ambulatory, or who appears to be in a state of emergency" to the hospital emergency room. Id. at 141-42.

## II.     Berry's Experience at the CVRJ

After being arrested by deputies from the Orange County Sheriff's Department on outstanding warrants, Shawn Christopher Berry arrived at the CVRJ for booking at around 4:27 p.m. on August 7, 2014. Aff. of Shannon Dickson 1-3, Docket No. 106. On the booking intake form, the arresting officer noted that Berry appeared to be under the influence of drugs and

alcohol and that Berry had affirmed that he was suffering from "real bad . . . DTs." Arresting/Transporting Officer Questionnaire, Docket No. 123-3 (internal quotation marks omitted). The booking officer also observed that Berry appeared to be under the influence of an intoxicant and "was kind of staring off, kind of stammering a little bit." Dep. of Colby Miller 3-4, Docket No. 123-8. The booking officer recorded on the booking observation form that Berry "will be going through withdrawal DTs" from heroin and alcohol use and indicated Berry had last used drugs at 10:00 p.m. on August 6, 2014. Booking Observation Form, Docket No. 123-6.

Berry then underwent a medical intake performed by Licensed Practical Nurse ("LPN") and supervisor Amanda Pitts. See Doctor's Notes, Docket No. 123-7; Dep. of Christie Apple Figgins 62, Docket No. 96. Pitts received the booking observation form and completed her own intake form. Dep. of Amanda Pitts 68, 75, Docket No. 93. In her notes, Pitts indicated that Berry had a history of asthma, hypertension, and drug and alcohol abuse, which included drinking a fifth of liquor and using heroin every day. Doctor's Notes. Berry complained of lower anterior rib pain. Id. While Pitts did not observe any sign of injury in the area, she noticed that Berry was wheezing. Id. She prescribed Albuterol for Berry's asthma, id., and ordered checks of Berry's vital signs, including his pulse and blood pressure, once a day for two days, and if Berry appeared unstable, every shift, Dep. of Pitts 35; Medical Intake Form, Docket No. 123-9. At that time, Berry had a pulse rate of 93 and a blood pressure reading of 128 over 94. Medical Intake Form.

Pitts ordered the vital signs checks to monitor Berry for any signs or symptoms of withdrawal. Doctor's Notes; Dep. of Pitts 35. She later testified that she believed Berry was undergoing only heroin, and not alcohol, withdrawal. Dep. of Pitts 36. She had previously treated inmates suffering from alcohol withdrawal and understood that some of the symptoms of

alcohol withdrawal overlap with the symptoms of heroin withdrawal, including nausea, vomiting, anxiety, agitation, and sweating. Id. at 17, 19-20. While Berry was not hallucinating or displaying other more serious signs or symptoms of alcohol withdrawal when Pitts observed Berry, she understood that an inmate was "probably not going to have any signs and symptoms" during the intake assessment "because it's very early after their last use" and inmates "don't start withdrawing 'til later on." Id. at 18, 29. She acknowledged that a nurse could perform a CIWA scale on an inmate in a number of cases including one in which the inmate displayed signs and symptoms of alcohol withdrawal or had a history of alcohol use. Id. at 28-31. Pitts had been trained on the policy manual when she started her position at the CVRJ. Id. at 35.

Following the intake assessment, CVRJ officials housed Berry in J Block. Shortly before 10:00 p.m. on August 7, Berry vomited on his jumpsuit. Dep. of M. Horrocks 15-16, Docket No. 94; Vogt Aug. 7, 2014 Incident Report, Docket No. 124-1. Two officers and an EMT escorted Berry, who was able to walk without assistance, to the medical department. Dep. of Horrocks 17; Vogt Aug. 7, 2014 Incident Report. The EMT determined that Berry was withdrawing from heroin and gave Berry Phenergan for nausea and Imodium for diarrhea. Dep. of Thomas Vogt 12-13, Docket No. 95. In an interview with Virginia State Police Investigators, Vogt said that Berry "looked like he had the shakes, like the shakes and hand tremors." Interview of Thomas Vogt 8, Docket No. 123-13. While testifying in this case, Vogt asserted that Berry did not show signs of alcohol withdrawal, "like tremors or delusions, hallucinations, sweating, anxiety, [or] agitation." Dep. of Vogt 12, 17-18.

The officers then transferred Berry to booking, where a booking officer could monitor him. Dep. of Horrocks 24; Dep. of Miller 5-6. The CVRJ did not staff the medical department from 11:00 p.m. until 5:30 a.m., but relied on an on-call physician for emergencies. Id. at 34.

The booking officer on duty observed that Berry rose at least once during the night to vomit, but otherwise appeared to sleep through the night. Dep. of Horrocks 24; Dep. of Miller 5-6.

The next morning, on August 8, 2014, Berry visited the medical department, where LPN Christie Apple-Figgins checked his vital signs as Pitts had directed and determined that he had a pulse rate of 116 and blood pressure of 132 over 90. Dep. of Apple-Figgins 31, 34; Medical Intake Form. Apple-Figgins had access to the booking intake form and Pitts' notes, but she did not look at them while evaluating Berry. Dep. of Apple-Figgins 47-48, 58. She asked Berry why she needed to check his vital signs, and Berry responded that he used heroin. Id. at 36. Apple-Figgins testified that she does not recall Berry mentioning alcohol. Id. Apple-Figgins had been shown the medical department's policies when she started working at the CVRJ. Id. at 14.

Berry returned to his cell, where officers arrived to escort Berry to the Orange County courthouse for a scheduled appearance. Dep. of Michael Frazier 15, Docket No. 97. Berry appeared delusional and had lost track of time. Id. Officers drove Berry to the courthouse, but upon observing Berry to be "visibly ill" and "barely able to hold his head up," the court sent Berry back to the CVRJ until he became well enough for a hearing. Virginia State Police Notes, August 11, 2014, Docket No. 125-8. Berry returned to the booking area of the CVRJ, where he refused to eat breakfast, lunch, or dinner. Jail Activity Log, Docket No. 124-12. Security officers would notify the medical department if an inmate refused multiple meals. Dep. of Apple-Figgins 143.

That night, Berry complained to the booking officer about difficulty breathing. VSP Investigation Notes, Docket No. 124-7. The officer noticed that Berry was sweating, but also that he was moving around easily and that his breathing was improving. Id. Berry later confirmed that he felt fine. Id.

The next morning, on August 9, 2014, the new booking officer on duty regularly checked on Berry. Dep. of Erin LaPanta 36-39, Docket No. 107. Apple-Figgins learned that Berry had refused to go to the medical department for a vital signs check and understood that he was in booking because he required monitoring. Dep. of Apple-Figgins 96-97.

Shortly before 9:30 a.m., Berry requested a shower because he had vomited and defecated on himself. Dep. of LaPanta 56-60. The booking officer called for assistance, and two officers arrived to transport Berry on a wheelchair to the shower. Id. They placed a chair in the shower stall for Berry to sit on, and left Berry alone in the stall until one of the officers heard water hitting the floor, indicating that Berry was not standing directly beneath the shower head. Boston Incident Report Aug. 8, 2014, Docket No. 124-3; Dep. of Jeremy Boston 25, Docket No. 99. The officer entered the stall and found Berry lying on the floor, half dressed. Dep. of Boston 26. Berry had vomited on the floor and was dry heaving. Id.

Jail personnel alerted Apple-Figgins to Berry's fall, and she responded to the shower to provide medical assistance. Dep. of Apple-Figgins 78. Apple-Figgins later testified that she never saw the vomit. Id. at 85. When Apple-Figgins assessed Berry, he reported that he had become dizzy and fallen. Id. at 80. Apple-Figgins left Berry to retrieve medications and equipment to check Berry's vital signs and ordered Gatorade to be delivered to Berry. Id. at 90-91.

When she returned to the booking area, Apple-Figgins found Berry lying in his bunk. Id. at 110. After an officer assisted Berry with sitting up, Apple-Figgins checked Berry's vital signs, noting his pulse as 108 and his blood pressure as 104 over 62. Id. at 111; CVRJ Nurse's Notes Aug. 9, 2014, Docket No. 124-6. Berry stated that he only wanted to rest, and Apple-Figgins gave him Phenergan and Ibuprofen before leaving him in his cell. CVRJ Nurse's Notes Aug. 9,

2014.

Around the time of this incident, Apple-Figgins also spoke with the booking officer on duty. Dep. of LaPanta 60. The booking officer claims that she informed Apple-Figgins that Berry's vomit "was like coffee grounds," which Apple-Figgins identified as dry blood in the vomit. Id. at 60-61. The booking officer testified that Apple-Figgins "seemed to think it was okay." Id. Apple-Figgins does not recall ever seeing vomit with a coffee-ground texture, but recalls seeing "what looked like somebody spit on the floor" and that the booking officer asked her to describe the appearance of vomit with blood in it. Dep. of Apple-Figgins 123.

Apple-Figgins asserts that she requested that the officer inform her if Berry vomited again and to notify medical personnel if Berry did not eat his lunch or drink his Gatorade. Id.; CVRJ Nurse's Notes Aug. 9, 2014. Apple-Figgins had previously given Berry a biohazard bag to collect his vomit for examination. Dep. of Apple-Figgins 123-24. Apple-Figgins did not receive any further reports about Berry. Id.

Before she left at the end of her shift at 4:00 p.m., she informed the incoming on-duty nurse, Nursing Assistant Jasmine Buckner-Jones, that Berry was withdrawing from heroin, that he had received Gatorade, and that the booking department had been advised to contact the medical department should Berry need anything. Dep. of Jasmine Buckner-Jones 50, Docket No. 100. Buckner-Jones had seen the CVRJ's medical manual, which included the policies on drug and alcohol withdrawal. Id. at 19. She later testified that the symptoms of alcohol withdrawal include tremors, elevated blood pressure, elevated pulse, sweating, and hallucinations and that the symptoms of heroin withdrawal resemble the symptoms of the flu and include nausea, vomiting, and diarrhea. Id. at 54.

Meanwhile, the booking officer checked on Berry at least twenty times. Dep. of LaPanta

71-72. In her incident report, she noted that Berry continued to become sick throughout the day, and his stool and vomit continued to have the appearance of coffee grounds. LaPanta Incident Report Aug. 9, 2014, Docket No. 124-2. The booking officer also reported that Berry drank one large pitcher of Gatorade but not the second pitcher she had ordered. See VSP Interview of LaPanta, Docket No. 128-4. Berry did not eat lunch or dinner. Id.; Dep. of LaPanta 71-72. As Berry's symptoms progressed, an officer moved Berry's mattress onto the floor to guard against falling. Dep. of Chad Lee 19-22, Docket No. 101; Dep. of Robert Counts 28-29, Docket No. 98.

At around 5:20 p.m., in response to Berry's request for assistance with using the toilet, a male officer arrived at Berry's cell and found Berry confused and disoriented. Dep. of Counts 28-29. The officer's attempt to assist Berry with walking to the toilet further disoriented Berry, who partially closed his eyes, made jerking motions, and became unresponsive for a few minutes in a "fit" or "spasms." Id. at 29-30; LaPanta Incident Report Aug. 9, 2014.

At approximately 5:29 p.m., the officer called Buckner-Jones to Berry's cell. Buckner-Jones Incident Report, Docket No. 123-12. When Buckner-Jones arrived at the cell, she found Berry lying on the floor, appearing weak and complaining that he needed to use the toilet. Id. Buckner-Jones checked Berry's vital signs and found that he had a pulse of 89 and blood pressure of 130 over 74. Id. Buckner-Jones then left to call Pitts about the requirements for sending an inmate to the hospital. Id. Plaintiff notes that, before Buckner-Jones left to retrieve the paperwork, she "stood idly in the booking department for nearly two minutes . . . ." Pl.'s Opp. Br. 13. Surveillance video shows Buckner-Jones near Berry's cell from about 5:35:17 until about 5:37:17 before she left to retrieve paperwork.

During Buckner-Jones' absence, two officers attempted to lift Berry into a standing position. Dep. of Counts 36. They placed Berry on the toilet, and he immediately leaned against

the wall. Id. The officers then placed Berry back on the mattress and placed a second mattress next to him. Id. Berry coughed up a small amount of blood. Id. at 37. The officers moved Berry onto his side and into the "recovery" position, and when Berry's coughing seemed to cease, they moved him back onto the mattress. Id. Within a minute or two, Berry emitted a large spout of blood from his mouth. Id. The officers again placed Berry into the recovery position, and Berry appeared to stop breathing. Id.

At 5:36 p.m., one of the officers called Buckner-Jones to tell her Berry was throwing up "massive amounts of blood." Buckner-Jones Incident Report. At 5:38 p.m., the officers called a code blue for a cardiopulmonary arrest. Id.

Buckner-Jones returned to booking and saw Berry lying on his back, bleeding from his mouth, ears, and nose. Id. She and one of the officers attempted to locate a pulse, but found none. Id. The officers and Buckner-Jones reported that they used automatic external defibrillator equipment and performed CPR on Berry in an attempt to revive him. Id.; Dep. of Buckner-Jones 79. At 5:45 p.m., an officer called 911. Dodson Incident Report, Aug. 9, 2014, Docket No. 128-8; 911 Call Log, Docket No. 125-3. Orange County EMS responded in less than five minutes. EMS Report, Docket No. 128-10. At 6:17 p.m., Berry was declared dead. Id.

### III. Expert Opinions on Berry's Death

Plaintiff offers the opinion of LPN Kimberly Harvey on the standard of care applicable to the defendants and the opinion of Dr. Russell Surasky on both the standard of care and the cause of Berry's death. Defendants offer the opinion of Dr. Timothy Allen on both the standard of care and the cause of death.

#### A. LPN Harvey

Harvey, who previously provided nursing care in a prison facility, describes the standard

of care for licensed practical nurses. Report of Kimberly Harvey 2, Docket No. 125-11. She asserts that standard practice for licensed practical nurses includes documenting care completely and accurately, monitoring vital signs, communicating a patient's complaints to a nurse or physician to assist with future treatment, and ensuring continuity of care. Id. at 3-5.

Harvey opines that the Medical Defendants' conduct fell below the standard of care in the following ways. She asserts that Pitts should have inquired about Berry's alcohol use and withdrawal symptoms during the initial assessment in light of the arresting and intake officers' reports. Id. at 4-5. As to Apple-Figgins, Harvey asserts that basic nursing care required Apple-Figgins to evaluate the booking officer's report of coffee-ground looking vomit, report that symptom to a physician, and refrain from administering Ibuprofen to Berry when such vomit indicated possible gastrointestinal bleeding, for which Ibuprofen is contraindicated. Id. at 7, 12-13.

According to Harvey, basic nursing care also required the Medical Defendants to continue to assess Berry and react to his worsening condition rather than to delegate such tasks to the non-medical jail staff. Id. at 8-12, 14. In particular, Harvey asserts that a reasonable licensed practical nurse would have notified a physician of Berry's worsening condition after observing his continued vomiting and diarrhea, persistent refusal to eat or take medication, increased weakness, fall in the shower, coffee-ground vomit, lethargy, incontinence of bowels, dizziness, inability to sit independently or ambulate, and low blood pressure after falling in the shower. Id. at 11-12.

### B. Dr. Surasky

Dr. Russell Surasky, a board-certified neurologist, opines that the CVRJ staff failed to recognize and treat Berry's alcohol withdrawal, resulting in Berry's death. Report of Dr. Russell

Surasky 3, Docket No. 125-10. He explains that Berry had the risk factors for DTs, including a history of persistent drinking and previous DTs, an age of over 30, and a concurrent illness. Id. He further notes that the CVRJ was aware of Berry's history of alcohol use and likely withdrawal because Berry informed the arresting officers that he was experiencing DTs and documentation confirmed that Berry drank heavily every day. Id. at 2-3.

Dr. Surasky explains that early management of the symptoms of alcohol withdrawal can prevent death from DTs. Id. at 3. Accordingly, Dr. Surasky concludes that the CVRJ could have avoided Berry's death had the defendants recognized and appropriately treated Berry's alcohol withdrawal symptoms rather than complacently attributing such symptoms to Berry's concurrent heroin withdrawal. Id. In sum, Dr. Surasky concludes that had the defendants recognized that Berry's history and symptoms required "an early transport to an acute care hospital setting[,] . . . [he] would have been accurately diagnosed and treated and he would not have died." Id.

### C. Dr. Allen

Defendants offer the expert report of Dr. Allen, a physician certified in psychiatry and neurology. Dr. Allen concludes that the CVRJ staff acted within the applicable standard of care and did not cause Berry's death. Report of Dr. Timothy Allen, Docket No. 128-12.

In opining on the applicable standard of care, Dr. Allen refutes several specific allegations of below-standard care made in the complaint. He notes that multiple staff members acted properly in recognizing that Berry abused drugs and in attending to the early symptoms of drug withdrawal, including nausea and vomiting. Id. at 1. He contends that administering medications to Berry orally was not improper because Berry experienced long periods in which he was not vomiting and could consume medication and fluids orally. Id. at 1-2. Moreover, administering Ibuprofen was proper because Berry did not have any clear symptoms of

gastrointestinal bleeding, as confirmed by the lack of significant gastrointestinal bleeding indicated in the autopsy report. Id. at 2.

Dr. Allen further asserts that the standard of care did not require the CVRJ medical staff to know Berry's baseline blood pressure, which was higher than normal because of Berry's history of hypertension, and to react to decreases from that baseline to levels within a normal range. Id. Nor, according to Dr. Allen, did the CVRJ staff fail to recognize the signs and symptoms of deficient fluid volume and hypovolemic shock. Id. Although Berry's blood pressure dropped 20 points from August 8 to August 9, Dr. Allen contends that the drop did not necessarily indicate hypovolemic shock, particularly when Berry appeared alert and was drinking Gatorade at his lowest blood pressure reading on the morning of August 9. Id. Finally, Dr. Allen refutes the suggestion that the CVRJ staff unduly delayed seeking emergency assistance. He opines that calling EMS about 27 minutes after Berry seized fell within the standard of care because such seizures do not pose undue danger on their own. Id.

With respect to causation, Dr. Allen opines that Berry's death from drug and alcohol withdrawal was unexpected and unforeseeable. Id. at 4. Dr. Allen challenges the contention in plaintiff's opposition brief that the defendants should have been aware of Berry's likelihood to experience alcohol withdrawal. Dr. Allen asserts that Berry's statements and behavior with the arresting officers and the initial booking officer did not strongly suggest that Berry would suffer from severe alcohol withdrawal or die from such withdrawal, particularly when such deaths are exceedingly rare. Id. at 3. According to Dr. Allen, Berry's alcohol withdrawal did not become apparent until 5:20 p.m. on August 9, when Berry began to decline and the CVRJ staff appropriately called a code blue and 911. Id. Neither assessing Berry on the CIWA scale, which Dr. Allen admits is standard practice for evaluating withdrawal, nor calling a doctor at 5:20 p.m.

would have prevented Berry's death at that point.  Id.  Dr. Allen concludes that Berry's presentation did not indicate a likely serious withdrawal, and therefore Berry's death was unforeseeable.  Id.

## IV.    Other Instances at the CVRJ

Plaintiff offers the accounts of two former CVRJ EMTs as evidence of other instances of deliberate indifference to inmates' needs for medical care at the CVRJ.  The EMTs are Lisa Marston and Jennifer Lewis.

### A. Lisa Marston

Lisa Marston testified that the CVRJ lacked protocols for caring for inmates withdrawing from drugs or alcohol, and instead, avoided sending inmates to the hospital because such a trip cost $2,000.  Dep. of Lisa Marston 44-45, Docket No. 125-9 ("There were no protocols for people who were withdrawing from alcohol.  There were no protocols for people who were withdrawing from drugs. . . .  There were people that were brought into the jail that . . . should have been taken to the emergency room.").  As an example, Marston explained that on one occasion an inmate had a gash over his eye following a fight with another inmate and required emergency stitches, an x-ray, and an examination.  Id. at 48-49.  Apple-Figgins and Pitts told Marston that the inmate could not go to the hospital because the trip would cost $2,000.  Id.  A CVRJ staff member later lodged a complaint against Marston for sending two inmates to a hospital.  Id. at 65.

When Marston resigned, she complained about the medical staff to Superintendant F. Glenn Aylor.  Specifically, she explained to Aylor that other medical staff instructed her not to send inmates to the hospital because of the cost; that some inmates would not receive medication such as Tylenol for hours or days; and that the doctor rarely provided care at the jail.  Id. at 45,

64. According to Marston, Aylor told her that if she stayed in her position, she "would turn out to be just like the rest of them . . . where it would not bother [her]." Id. Marston testified that Aylor did not respond to her complaint of being reprimanded for sending inmates to the hospital. Id. at 65.

## B. Jennifer Lewis

Jennifer Lewis submitted an affidavit describing her seven-month tenure as an EMT at the CVRJ. Decl. of Jennifer Lewis ¶ 2, Docket No. 125-12. She described her direct supervisor, Pitts, as "dismissive about medical care for prisoners." Id. ¶ 3. On one occasion, she observed an inmate request medication, which the CVRJ did not have. Id. Pitts instructed Apple-Figgins to mark down that the inmate had refused the medication. Id. Lewis also described an inmate who had a broken hand, which Lewis splinted only to learn the next morning that the splint had been removed. Id. ¶ 7. Lewis avers that Pitts told Lewis that the broken hand was a pre-existing condition that the CVRJ did not need to treat. Id.

As to the medical department in general, Lewis attested that she never met the two physicians for the CVRJ and that she received minimal training. Id. ¶ 4. Inmates who did not hear a "med call," would not receive the medication, regardless of his or her condition. Id. ¶ 5. If the inmate missed five med calls, the CVRJ discontinued the med calls for that medicine. Id. The CVRJ also charged inmates for a variety of medical aids, including Ibuprofen and bandages, causing, in Lewis' opinion, some inmates to occasionally refuse such aids to avoid charges. Id. ¶ 6.

When Lewis resigned, she submitted a letter to the Captains at the CVRJ, explaining the problems she had observed. Id. ¶ 9. The letter explained that every time Lewis tried to follow the CVRJ's medical protocols, she "was told not to" and to "just do what the doctor does."

Lewis Letter to Captains of Jail, Docket No. 125-13. After her resignation, a woman called Lewis on behalf of Aylor to request that Lewis return to work at the CVRJ and to advise Lewis that failing to return could jeopardize Lewis' career. Decl. of Lewis ¶ 10.

## Procedural History

On June 2, 2015, Thornhill filed the instant action against eleven defendants. Before filing the complaint, Thornhill obtained a written opinion from a registered nurse, Meghan D'Angelo. In her report, D'Angelo stated that "[i]n my professional opinion with 17 years of nursing experience, the health care providers named in the complaint failed to exercise a reasonable standard of care in treating Shawn Berry." Report of Meghan D'Angelo 2, Docket No. 143-1. She identified nine deviations from the standard of care, including failing to recognize the risks related to the imminent likelihood of withdrawal; failing to properly monitor Berry's vital signs, stability, and symptoms of various health problems; and failing to treat several signs and symptoms of withdrawal. Id. at 2-3. She opined that the symptoms of gastrointestinal bleeding "should have merited an emergent transfer to a hospital for treatment that could have saved Mr. Berry's life." Id. at 3.

On August 27, 2015, Thornhill filed an amended class action complaint. The defendants filed separate motions to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the court granted in part and denied in part. Only Count II, asserting a claim for damages under 42 U.S.C. § 1983, and Count III, alleging wrongful death in violation of Virginia Code § 8.01-50, remain pending against the Authority, Aylor, and the Medical Defendants.

During discovery, the defendants requested all documents that Thornhill received from any medical professional regarding Berry. Thornhill produced the autopsy report, dated October

7, 2014, and D'Angelo's report, dated June 1, 2015. The autopsy report was signed by a medical doctor, Jocelyn Posthumus, and listed Berry's cause of death as "[a]dverse effects of heroin and ethanol" and referred to the manner of death as an "[a]ccident." Autopsy Report at 8, ECF No. 142-2.

On February 17, 2017, the defendants moved for leave to file an amended answer, which proposed to add a sixth affirmative defense that Thornhill had failed to comply with the procedural requirements for medical malpractice claims in Virginia, including but not limited to the requirement of obtaining a certifying expert witness. The court granted the motion.

The parties then filed several discovery motions, and the remaining defendants filed a motion for summary judgment as to Count II. In responding to the summary judgment motion, the plaintiff attached a report from Dr. Russell Surasky, D.O., dated June 14, 2017, and a report from Kimberly Harvey, LPN, dated June 23, 2017. The parties appeared before the court for a hearing on the summary judgment motion and discovery issues on August 10, 2017. Shortly thereafter, the court issued an order resolving the discovery disputes.

On August 3, 2017, the defendants filed a motion to dismiss Count III. The parties agreed to submit the motion to the court without a hearing. Both the motion for summary judgment and the motion to dismiss are now ripe for review.

## Defendants' Motion for Summary Judgment

### Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to

grant summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. Anderson, 477 U.S. at 255.

## Discussion

Section 1983 imposes civil liability on any person acting under color of state law to deprive another person of the rights and privileges secured by the Constitution and the laws of the United States. 42 U.S.C. § 1983. Plaintiff argues that the defendants violated Berry's rights under the Due Process Clause of the Fourteenth Amendment by acting with deliberate indifference to his serious medical needs.

The defendants assert that no genuine disputes of material fact remain regarding the Medical Defendants' liability, municipality liability, or supervisory liability, and thus, that they are entitled to summary judgment. The individual defendants further assert the affirmative defense of qualified immunity.

## I. Medical Defendants' Liability

Pretrial detainees have a "clearly established" right "to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001) (internal quotation marks omitted).

Deliberate indifference has both an objective and a subjective component. The objective component requires a showing of a "sufficiently serious" medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The subjective component requires a plaintiff to show that the official knew of and disregarded an excessive risk to a detainee's health. Id. at 837.

Under the objective component, the court previously recognized that the symptoms of alcohol and drug withdrawal may amount to a serious medical need. Thornhill v. Aylor, No. 3:15-CV-00024, 2016 WL 8737358, at *9 (W.D. Va. Feb. 19, 2016) (collecting cases). At this stage of the proceedings, the court concludes that the plaintiff has made a sufficient showing of a serious medical need based on the progression of Berry's symptoms.

As to the subjective component, an official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and the official must have also drawn the inference. Farmer, 511 U.S. at 837. A plaintiff may satisfy this standard with evidence that an official "subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were inappropriate in light of that risk." Parrish v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (internal quotation marks omitted). While an official cannot be liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," Farmer, 511 U.S. at 844, a factfinder may infer that an official subjectively appreciated a serious risk to an inmate based on "circumstantial evidence" that the official knew the risk of harm or by the obviousness of the risk itself, id. at 842.

Medical professionals receive deference, however, in determining a proper course of treatment. Mere disagreement with a medical professional's selected course of treatment does not suffice to show an inappropriate response to a serious medical risk. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "Implicit in this deference to prison medical authorities is the assumption that . . . an informed judgment has, in fact, been made." Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); see also Collignon v. Milwaukee Cty., 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if

19

the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

The court separately applies the standard for the subjective component to each of the three Medical Defendants: (1) LPN Pitts, (2) LPN Apple-Figgins, and (3) Nursing Assistant Buckner-Jones.

## A. LPN Pitts

On this record, the court finds that the plaintiff has produced sufficient evidence to satisfy both prongs of the subjective component of deliberate indifference. First, the record contains sufficient evidence that Pitts was aware of facts from which she could infer that Berry was imminently likely to withdraw from drugs and alcohol and that Pitts drew the inference. Berry reported to her that he drank a fifth of liquor and used heroin every day. Pitts admitted she received the booking observation report, which indicated that Berry would be withdrawing from drugs and alcohol. Berry also appeared intoxicated and unwell to the arresting officer and the booking officer in the moments before Pitts evaluated Berry. Pitts at least observed that Berry had difficulty breathing, which she described as wheezing. As a licensed practical nurse familiar with the CVRJ's policy manual on drug and alcohol withdrawal, Pitts knew that untreated withdrawal could progress into serious symptoms. These facts indicate that Pitts observed symptoms of drug and alcohol withdrawal from which she could infer that Berry faced a substantial risk of serious harm. A reasonable factfinder could conclude that Pitts drew the required inference when she ordered checks of Berry's vital signs for the purpose of monitoring him for the signs and symptoms of withdrawal.

While Pitts now claims that she believed Berry was at a risk for only heroin, and not

alcohol, withdrawal, Dep. of Pitts 36, the circumstantial evidence provides a basis for a reasonable factfinder to conclude otherwise. See M.H. v. Cty. of Alameda, 62 F. Supp. 3d 1049, 1077-78 (N.D. Cal. 2014) (finding sufficient circumstantial evidence for a factfinder to conclude that a nurse drew the inference that an inmate faced a serious risk of alcohol withdrawal when the inmate had informed the nurse that he drank daily and appeared intoxicated upon intake). The record shows that Pitts was a trained licensed practical nurse with knowledge of the CVRJ's medical policies and the signs and symptoms of alcohol and heroin withdrawal. She knew that Berry had a history of alcohol abuse and that the signs of alcohol withdrawal would develop later, but she did nothing to account for Berry's substantial risk of alcohol withdrawal.

At the very least, Pitts has admitted to apprehending Berry's likely withdrawal from heroin. Providing minimal treatment to an inmate that a nurse knows is likely to suffer heroin withdrawal also serves as a basis for a deliberate indifference claim. See Gonzalez v. Cecil Cty., 221 F. Supp. 2d 611, 616 (D. Md. 2002).

Second, the record contains sufficient evidence to permit a jury to conclude that Pitts disregarded the known serious risks of both alcohol and heroin withdrawal. Although Berry "had not yet manifested the most pronounced signs of withdrawal," Pitts was not relieved from "protect[ing] him from known substantial risks." Stefan v. Olson, 497 F. App'x 568, 579 (6th Cir. 2012). A reasonable factfinder could determine that Pitts' avoidance of the very information that would have allowed her to appropriately recognize and treat Berry for imminent alcohol, as well as heroin, withdrawal amounted to deliberate indifference. See M.H., 62 F. Supp. 3d at 1077 (explaining that the "failure to medically screen new inmates may constitute deliberate indifference to medical needs" when the medical professional knows that an inmate has a history of alcohol abuse); cf. Farmer, 511 U.S. at 842 (rejecting the argument that the test for deliberate

indifference "present[s] prison officials with any serious motivation to take refuge in the zone between ignorance of obvious risks and actual knowledge of risks" (internal quotation marks omitted)).

Pitts did not obtain that information because she did not follow the CVRJ's policy manuals regarding alcohol withdrawal. Although the CVRJ policy manuals advise the medical staff to perform the CIWA scale when an inmate appears intoxicated or describes a history of alcohol abuse, Pitts did not perform the test. The failure to initiate CIWA protocol for an inmate who describes a history of alcohol abuse and appears intoxicated may constitute deliberate indifference. M.H., 62 F. Supp. 3d at 1077-78. Pitts also did not obtain as much information about Berry's medical history as she could, such as the time of Berry's last alcoholic beverage and his history of withdrawal. Nor did she order that Berry be monitored in accordance with the policy manual, which instructs medical staff to perform vital signs checks every 15 minutes for cases of heroin withdrawal and every 2 hours during the first 24 hours for cases of alcohol withdrawal. CVRJ Medical Policy Manual at 93, 141. Pitts only checked Berry's vital signs once and only ordered checks once per shifts. Compliance with the CVRJ's protocols would have indicated appropriate care. Montgomery v. Conmed, Inc., No. CV ELH-13-00930, 2016 WL 241738, at *12 (D. Md. Jan. 19, 2016), aff'd, 678 F. App'x 95 (4th Cir. 2017).

In addition to Pitts' failure to adhere to CVRJ's policy manual, the record contains other evidence that could indicate that Pitts did not comply with the basic standard of care. Defendants' expert, Dr. Allen, concedes that administering the CIWA scale is standard protocol for patients at risk for alcohol withdrawal. Report of Dr. Allen 2. As Dr. Surasky opines, early treatment of the signs of alcohol withdrawal can prevent the progression to more serious symptoms and even death. Report of Dr. Surasky 3. Thus, construing the record in the light

most favorable to the plaintiff, as the court must, the court finds summary judgment inappropriate on the § 1983 claim against Pitts.

## B. LPN Apple-Figgins

The court also finds sufficient evidence to preclude summary judgment on Count II against Apple-Figgins. Under the first prong of the subjective component for deliberate indifference, the court observes that Berry informed Apple-Figgins about his withdrawal from heroin.

Additionally, the court finds sufficient evidence that Apple-Figgins was aware of facts from which she could draw the inference that Berry was also withdrawing from alcohol. A fact issue exists over whether the night before Apple-Figgins met Berry he experienced shakes or tremors. These signs may have persisted when Apple-Figgins observed him over the course of the next two days. Berry had also been refusing meal trays, a fact that security would have reported to the medical department. Shortly after Apple-Figgins met Berry, non-medical personnel reported that he appeared confused and disoriented, "visibly ill," and "barely able to hold his head up." Dep. of Frazier 15; Virginia State Police Notes, August 11, 2014. The next time Apple-Figgins observed Berry, he had fallen in the shower. Although Apple-Figgins testified that she did not see any vomit near Berry, an officer testified that Berry had vomited in the shower stall. Apple-Figgins did observe that Berry appeared unable to sit up on his own when she assessed his vital signs. Berry then stated that he only wanted to rest. Moreover, prior to the shower, Berry had been observed sweating and experiencing difficulty breathing. A reasonable factfinder could conclude that when Apple-Figgins observed Berry, he was exhibiting the following signs of alcohol or heroin withdrawal: shakes or tremors, confusion, an inability to walk without assistance, vomiting, sweating, difficulty breathing, lethargy, and semi-

23

consciousness.

A dispute of fact exists over whether Apple-Figgins knew that Berry was experiencing a more severe symptom of alcohol withdrawal, gastrointestinal bleeding, or was having difficulty retaining fluids or medications administered orally. One of the booking officers testified that she reported to Apple-Figgins that Berry was regularly vomiting and emitting coffee-ground looking vomit, but Apple-Figgins testified that the officer merely asked for a description of vomit containing blood.

In light of this circumstantial evidence and the apparent obviousness of the risk to individuals without medical training such as the officers at the courthouse, a factfinder could conclude that Apple-Figgins actually drew the inference that Berry faced a substantial risk of serious harm. See Farmer, 511 U.S. at 842. Additionally, as with Pitts, Apple-Figgins knew Berry was withdrawing from heroin and that his withdrawal symptoms were worsening.

Under the second prong, the court concludes that the summary judgment record also contains enough evidence to allow a reasonable jury to conclude that Apple-Figgins disregarded the known substantial risks to Berry. Where nurses or other medical staff have contacted physicians and followed the physicians' instructions, courts have been reticent to hold the medical staff liable. Compare Padula v. Trumbull Cty., No. 4:10CV2876, 2012 WL 3260231, at *7-9 (N.D. Ohio Aug. 8, 2012) (granting summary judgment to medical assistants who followed doctor's orders), with Reid v. Rovenstine, No. 3:05-CV-126 RM, 2007 WL 952007, at *4 (N.D. Ind. Mar. 26, 2007) (denying summary judgment to a nurse who did not refer an inmate for medical treatment and appeared to have disregarded the doctor's orders). However, when a nurse failed to seek further medical attention for an inmate who was defecating on himself and appeared confused, a court found fact issues precluding summary judgment on a deliberate

indifference claim. <u>Foelker v. Outagamie Cty.</u>, 394 F.3d 510, 512-14 (7th Cir. 2005). In this case, Apple-Figgins never sought the advice of a physician despite recognizing that Berry was undergoing withdrawal and that his symptoms were progressing to include persistent vomiting and defecating, weakness, and dizziness.

Defendants argue that contacting a physician was unnecessary because all of the Medical Defendants, and Apple-Figgins in particular, provided adequate treatment by checking Berry's vital signs, administering medication to treat his symptoms, and providing him with Gatorade. However, Apple-Figgins did not investigate the cause of Berry's fall in the shower, the alleged report of coffee-ground looking vomit, or whether Berry was improving in response to medication and fluids he had been receiving. The plaintiff has therefore presented evidence upon which a reasonable factfinder could conclude that Apple-Figgins did not treat Berry based on an informed medical opinion. <u>See Inmates of Allegheny Cty. Jail</u>, 612 F.2d at 762; <u>Collignon</u>, 163 F.3d at 989. Additionally, simply because the Medical Defendants provided Berry "with some treatment consistent with the [jail's policies], it does not follow that they have necessarily provided [him] with constitutionally adequate treatment." <u>De'Lonta v. Johnson</u>, 708 F.3d 520, 526 (4th Cir. 2013). "A total deprivation of care is not a necessary condition for finding a constitutional violation: Grossly incompetent or inadequate care can also constitute deliberate indifference . . . ." <u>Id.</u> (alterations and internal quotation marks omitted). On this record, the court finds that a reasonable juror could conclude that Apple-Figgins provided grossly incompetent care in failing to more thoroughly assess Berry's condition or communicate with a physician as his symptoms persisted and worsened for a third day.

### C. Nursing Assistant Buckner-Jones

Although a close call, the court finds sufficient evidence to preclude summary judgment

on the Fourteenth Amendment claim against Buckner-Jones. Apple-Figgins told Buckner-Jones that Berry was suffering from heroin withdrawal, and Buckner-Jones was aware that he had been vomiting for a prolonged period, had become unresponsive, and appeared to enter into a fit or spasms that indicated a seizure. A reasonable factfinder could conclude that Buckner-Jones drew the inference that Berry had a serious medical need because she sought to send Berry to the hospital. The risk might also have become obvious at that time. See Farmer, 511 U.S. at 842.

However, Buckner-Jones did not call a physician or 911 immediately after learning of Berry's spasms and weakness. A surveillance video shows her standing near Berry's cell for about two minutes before she left to seek direction on how to send Berry to the hospital. Evidence that a medical professional failed to report to a doctor when the need for treatment became obvious, Padula, 2012 WL 3260231, at *9-10, or that the professional intentionally delayed the administration of medical care to an inmate may amount to deliberate indifference, see Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). Thus, a reasonable factfinder could determine that Buckner-Jones disregarded a substantial risk of serious harm or ignored a serious need for additional medical treatment.

## II. Municipal Liability

A plaintiff may directly sue a local governing body, like the Authority, under § 1983 for monetary, declaratory, or injunctive relief. Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690 (1978). In this case, the plaintiff is suing the Authority and Aylor under two theories of municipal liability: (1) a policy or custom of deliberate indifference, and (2) a failure to adequately train employees.

### A. Policy or Custom of Deliberate Indifference

To establish municipal liability based on a policy or custom of deliberate indifference, a

plaintiff must show the existence of an official policy or custom that is fairly attributable to the municipal entity and that proximately caused the underlying constitutional violation. Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994).

A plaintiff may establish an official policy that is fairly attributable to a municipal entity by identifying certain affirmative decisions or omissions on the part of a policymaker. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). Under such circumstances, the policymaker's decisions or omissions that amount to deliberate indifference "may render liable both the official, in his individual capacity, and the municipal entity." Newbrough v. Piedmont Reg'l Jail Auth., 822 F. Supp. 2d 558, 585 (E.D. Va. 2011). A policymaker refers to an individual with the "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987). "The most critical factor is not the practical finality of an official's 'acts and edicts,' but their 'policy' nature." Id. (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)).

However, "[i]t is not enough to identify a policy or custom of deliberate indifference; Plaintiff must also allege that the policy or custom proximately caused the instant constitutional injury." Newbrough, 822 F. Supp. 2d at 584. The policy or custom must be "the moving force of the constitutional violation specifically charged." Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984) (internal quotation marks omitted). This relationship may be satisfied by evidence of "a logical and natural connection between a policy or custom of deficient medical care and an instance of inadequate medical care." Newbrough, 822 F. Supp. 2d. at 585.

In this case, the plaintiff has forecast evidence of an official policy to disregard the

CVRJ's written medical protocols and to condone informal practices of denying adequate medical care. Plaintiff alleges that this policy resulted from Aylor's actions as a policymaker. Plaintiff's evidence of Aylor's policymaking authority includes that Aylor served as the highest-ranking officer at the CVRJ and was the person who ultimately received and addressed complaints about the CVRJ's medical staff from two EMTs, Marston and Lewis. From these facts, a reasonable jury could conclude that Aylor had the authority to direct the goals of CVRJ's medical department. Defendants have not set forth evidence that Aylor lacked policymaking authority.

Assuming Aylor held such authority, the plaintiff has identified evidence to support her claim that Aylor's inaction created an official policy of deliberate indifference that was fairly attributable to the Authority. Marston and Lewis' complaints about the treatment of inmates at the CVRJ were made known to Aylor, and a reasonable factfinder could find that Aylor failed to refute Marston and Lewis' allegations or take action to remedy the problems they identified.

Finally, it appears to the court at this time that the plaintiff may be able to establish at trial a logical and natural connection between Marston and Lewis' statements and the alleged violation of Berry's constitutional rights. Marston and Lewis attested that CVRJ's medical staff: (1) disregarded the written CVRJ policies for providing medical care to inmates; (2) did not follow in practice any procedures for treating inmates undergoing drug or alcohol withdrawal; (3) avoided sending inmates to the hospital because of the cost of such trips; and (4) declined to provide aid to inmates for injuries or illnesses identified as preexisting conditions. In Berry's case, the plaintiff has forecast evidence that the Medical Defendants did not follow the CVRJ's written policies for treating inmates undergoing drug or alcohol withdrawal or consider sending Berry to the hospital until Berry's death became imminent. Accordingly, the court finds that a

reasonable jury could find that Berry's death from inadequately treated drug and alcohol withdrawal was a "natural and foreseeable consequence" of Aylor's inaction in response to complaints of deficient medical care at the CVRJ. Newbrough, 822 F. Supp. 2d at 587.

Defendants do not contest the statements of Marston or Lewis, but rather assert that Aylor could not have created a policy or custom with respect to inmates' medical care based on medical costs because he had no control over the Authority's expenditures for inmates' medical care. Defendants rely on the Authority's budgeting agreement with the five localities that house inmates at the CVRJ. This argument proves unavailing where the plaintiff has elicited evidence that Aylor knew that his medical staff had a different impression of the costs associated with care and he declined to correct that impression. Thus, the summary judgment record does not eliminate all genuine disputes of material fact or indicate that the defendants are entitled to summary judgment as a matter of law under the theory of a policy or custom of deliberate indifference.

### B. Policy of Failure to Train

A municipal entity may "be liable under § 1983 for inadequate training of its employees . . . only where the failure to train amounts to deliberate indifference . . . ." City of Canton v. Harris, 489 U.S. 378, 388 (1989). Under such circumstances, the failure to train evinces a policy or custom of deliberate indifference actionable under § 1983. Id. at 389. Municipal liability can be established if a supervisory power has received notice of a pattern of deliberate indifference, but has chosen not to respond with adequate training. Brown v. Mitchell, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004). A plaintiff may also show "that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably

29

be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. "Moreover, for liability to attach in this circumstance the identified deficiency in a . . . training program must be closely related to the ultimate injury." Id. at 391.

In this case, the court concludes that a reasonable jury could find the Authority liable under a theory of failure to train. As set forth above, the plaintiff has produced evidence upon which a reasonable jury could find that Aylor acted as a supervisory power at the CVRJ and received notice of a pattern indicating deliberate indifference. Neither Marston nor Lewis asserted that Aylor responded to their complaints by suggesting training, and the defendants have not contended otherwise. Because the Medical Defendants controlled the day-to-day provision of medical care to inmates, a reasonable jury may find that the need for additional training was obvious and the likelihood that the failure to send a seriously injured inmate to the hospital or to provide other treatment could result in a constitutional violation was high. See City of Canton, 489 U.S. at 390. The plaintiff has therefore projected evidence of a close relationship between evidence of a failure to train at the CVRJ and the medical care that Berry received. Thus, summary judgment is not appropriate under the failure-to-train theory.

## III. Supervisory Liability

In addition to seeking liability against Aylor as the Authority's policymaker, plaintiffs assert that Aylor is liable under § 1983 in his individual capacity as a supervisor. A supervisor may be liable for "constitutional injuries inflicted by [his] subordinates" in certain circumstances. Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). "[C]ontinued inaction in the face of widespread abuses . . . provides an independent basis for finding that [a supervisor] was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. at 373. A plaintiff establishes supervisory liability by showing: "(1) that the

supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Shroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

Here, the court first finds that the plaintiff has identified sufficient evidence at the summary judgment stage of Aylor's knowledge that his subordinates were engaging in conduct posing a pervasive and unreasonable risk of constitutional violations to detainees like Berry. Marston and Lewis averred that Aylor received complaints about deficient medical care at the CVRJ, including complaints that the medical staff failed to follow CVRJ's written policies or to send inmates to the hospital when appropriate. Second, as to whether Aylor tacitly authorized a pattern of deliberate indifference, the plaintiff has supplied Marston and Lewis' statements inferring that Aylor did not respond to their complaints about deficient medical care at the CVRJ, and the record does not contain evidence otherwise. Third, a reasonable trier of fact could conclude that Aylor's inaction was causally linked to plaintiff's claims of deliberate indifference against the Medical Defendants for the same reasons set forth above regarding causation for municipal liability premised on a policy of deliberate indifference.

## IV. Qualified Immunity

The individual defendants in this case, Aylor and the Medical Defendants, continue to seek qualified immunity from civil damages under Count II. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity, the court will: "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right." Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

In this case, the court has recognized that pretrial detainees have a clearly established due process right to medical attention under the Fourteenth Amendment. Gordon, 971 F.2d at 1094. The individual defendants therefore seek qualified immunity by arguing that they did not violate Berry's constitutional rights in the first instance. Because the court has found genuine disputes of material fact regarding whether the Medical Defendants or Aylor violated Berry's constitutional rights, the court denies their requests for qualified immunity.

In sum, the court finds that the remaining defendants are not entitled to summary judgment on Count II. Accordingly, the court will deny the defendants' motion for summary judgment.

## Defendants' Motion to Dismiss Count III

## Standard of Review

Under Virginia law, the court may dismiss a case with prejudice if, prior to serving process on the defendant, the plaintiff failed to obtain a signed, written opinion from a person "whom the plaintiff reasonably believes would qualify as an expert witness." Va. Code Ann. § 8.01-50.1. The opinion must assert that, "based upon a reasonable understanding of the facts," the defendant (1) "deviated from the applicable standard of care" and (2) that "the deviation was a proximate cause of the injuries claimed." Id. A witness who is not a licensed physician

qualifies as an expert on the applicable standard of care if the witness demonstrates expert knowledge on the standards governing the defendant's medical specialty and maintains an active clinical practice in the defendant's specialty or a related medical field. Va. Code Ann. § 8.01-581.20A; Creekmore v. Maryview Hosp., 662 F.3d 686, 691 (4th Cir. 2011). As for proximate cause, subject to an exception not applicable here, "only a medical doctor is qualified to give expert testimony about the cause of a human physical injury." Hollingsworth v. Norfolk S. Ry. Co., 689 S.E.2d 651, 653 (Va. 2010).

However, a plaintiff need not obtain a certifying expert witness if "the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Va. Code Ann. § 8.01-50.1. The Supreme Court of Virginia has recognized that this exception applies only in "rare circumstances." Beverly Enters.-Va. v. Nichols, 441 S.E.2d 1, 3 (Va. 1994) (finding expert testimony unnecessary regarding whether the defendant's employees were negligent in leaving a tray of food with a patient who was unable to feed herself and who previously had serious choking incidents).

## Discussion

Defendants argue that the plaintiff failed to obtain the required certifying expert opinion before serving process on the defendants. In particular, defendants argue that plaintiff failed to secure a doctor's opinion on the applicable standard of care or on whether the defendants' deviations from that standard of care caused Berry's death.

The court first observes that the defendants did not raise this argument in their first motion to dismiss Count III. Indeed, the defendants failed to move to dismiss Count III on the basis of the certification requirement until three years after the plaintiff filed the original complaint and after the plaintiff submitted two additional expert opinions.

Now that the defendants have belatedly raised this issue in a motion to dismiss, the court finds that the plaintiff could have reasonably believed she satisfied the certification requirement through two reports she had obtained by the time of service. D'Angelo's report addressed the applicable standard of care, and Dr. Posthumus' autopsy report provided an opinion on cause of death. The defendants cite no case law requiring a doctor to opine on the standard of care applicable to nursing defendants. Additionally, D'Angelo opined that the defendants' deviation from the applicable standard of care, in particular their failure to send Berry to the hospital in time, caused Berry's death. Dr. Posthumus' report also satisfied the requirement that a doctor opine on the cause of human injury in this case. The court finds that these two reports coalesce to satisfy the certifying expert requirement. To the extent the plaintiff now relies on these or other experts to prove her claim for wrongful death, the court will entertain separate motions regarding the sufficiency of the experts' opinions.

## Conclusion

For the foregoing reasons, the court will deny the defendants' motion for summary judgment as to Count II and the defendants' motion to dismiss Count III.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This _18th_ day of October, 2017.

_____
United States District Judge